Argued December 2, 1971, affirmed April 7, petition for rehearing
denied May 2, petition for review allowed
June 13, 1972

STATE OF OREGON, *Respondent, v.* LLOYD A.
FRY ROOFING COMPANY, *Appellant.*

495 P2d 751

*James H. Clarke*, Portland, argued the cause for appellant. With him on the briefs were McColloch, Dezendorf, Spears & Lubersky, and Herbert H. Anderson, Portland.

*Walter L. Barrie*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB,* Chief Judge, and FORT and THORNTON, Judges.

THORNTON, J.

Defendant corporation was indicted on four counts of air pollution in violation of the rules of the Columbia-Willamette Air Pollution Authority (hereinafter referred to as CWAPA) and ORS 449.990(19).①

In a second indictment returned two months later defendant was charged with four additional counts of the same offense. The two indictments were

---

* Schwab, C. J., did not participate in this decision.

① ORS 449.990(19):

"Violation of any rule adopted pursuant to ORS 449.875 or any final order of a regional air quality control authority entered under ORS 449.895 is a misdemeanor and is punishable upon conviction by a fine of not more than $1,000, or by imprisonment in the county jail for not more than one year, or by both. Each day of violation constitutes a separate offense."

Except as otherwise noted all references in this opinion to statutes are to the versions in effect at the time of the alleged violations, many of which have since been amended. For example, the above-quoted statute has since been renumbered, and is now codified as ORS 449.990(20). See also, footnote 3.

tried separately, one by the court without a jury, and the other with a jury.[2] Defendant was found guilty on all charges. Defendant's appeals from the resulting two judgments have been consolidated in this court.

On appeal defendant contends that the two trial judges erred:

(1) In upholding the constitutionality of the administrative rule of CWAPA prohibiting air pollution.

(2) In failing to sustain defendant's objection to the admissibility of the testimony of the state's witnesses with reference to alleged air pollution incidents. That even if admissible, such testimony was insufficient.

(3) In denying defendant's motion for acquittal on the ground that the state and CWAPA had failed to follow mandatory administrative procedures prior to instituting criminal prosecution.

Defendant also contends that the court in the jury case erred in failing to instruct fully on the elements of the crime and in giving instructions allowing the jury to convict on the basis of the statutory presumption of intent.

### Constitutionality of the Administrative Rule

The CWAPA air purity standard rule which defendant was accused of violating provided:[3]

"(a) A person shall not discharge into the

---

[2] We will hereafter refer to the two trials by their circuit court numbers, i.e., the trial of the first indictment as C-56168, and the trial of the second indictment as C-56867.

[3] All references in this opinion to CWAPA rules are to the versions in effect at the time of the alleged violations, many of which have since been amended. See also, footnote 1.

atmosphere from any single source of emission whatsoever any air contaminant for a period or periods aggregating more than three minutes in any one hour * * * which is:

"* * * * * *

"(2) Of such opacity as to obscure an observer's view to a degree equal to or greater than does smoke as dark or darker in shade as that designated as No. 2 on the Ringelmann Chart.

"* * * * *." Section 2-2.1(a) (2).

Since many of the issues raised on appeal revolve around the meaning of this rule, we begin with an explanation of it. We also at this point consider defendant's constitutional challenges to the validity of the rule.

Section 2-2.1(a)(2) of CWAPA's rules is concerned with only one *visual characteristic* of emissions such as smoke. (Other sections of CWAPA's rules, not here involved, deal with the other characteristics of smoke, such as content of possibly dangerous gases, odor, etc.) More specifically, Section 2-2.1(a)(2) regulates the degree to which smoke obscures an observer's view of the background, such as the sky or Mt. Hood, which, except for the smoke, would otherwise be visible.

The standard device for measuring the degree to which smoke obscures the background is known as the Ringelmann Chart, which we have previously described in detail. *See, Portland v. Fry Roofing Co.,* 3 Or App 352, 472 P2d 826, Sup Ct *review denied* (1970). No. 2 on the Ringelmann Chart, referred to in Section 2-2.1 (a)(2), means 40 per cent or more of the background is obscured.

Another provision of CWAPA's rules, not directly involved in these cases, forbids emissions into the air for more than three minutes per hour which are

"As dark or darker in shade as that designated as No. 2 on the Ringelmann Chart, as published by the United States Bureau of Mines in Information Circular 8333 dated May 1967 * * *." Section 2-2.1(a)(1).

Section 2-2.1(a)(2), upon which these prosecutions are based, immediately follows this provision. The rules are organized in this manner because the Ringelmann Chart itself is only used for measuring black and/or gray smoke.[4] For emissions of other colors, such as the white smoke at defendant's plant, the Ringelmann Chart itself is not used to evaluate obstruction of the background, but the standards of the Chart are incorporated into the rule. In other words, to paraphrase Section 2-2.1(a)(2): it is illegal to emit smoke for more than three minutes in one hour that obscures an observer's view of 40 per cent or more of the background behind the plume.

Our explanation of the rule in question could stop at this point were it not for the term "opacity" used in Section 2-2.1(a)(2) of CWAPA's rules; many of defendant's arguments concern this term. Technically, opacity means want of transparency or the degree to which transmitted light is obscured. Opacity is judged in the field during air pollution work by the extent to which an observer's view is obscured, i.e., a smoke reader makes his evaluation of opacity on the

---

[4] The records in these cases include testimony and exhibits about the Ringelmann Chart. Some of this evidence is to the effect that the Chart is only used for black smoke, and some of it is to the effect that the Chart is only used for gray smoke.

basis of the amount of background that he cannot see through an emission.

For black or gray smoke, opacity can be measured with a Ringelmann Chart. Other smoke is evaluated through a process referred to in the record as "equivalent opacity." This simply means that white smoke which obscures more than 40 per cent of the background is in violation of CWAPA's rules, because it is equivalent to smoke as dark or darker in shade as that designated as No. 2 on the Ringelmann Chart.

"Opacity" is defined in CWAPA's rules as

"* * * the degree to which an emission reduces transmission of light and obscures the view of an object in the background." Section 2-1.1(v).

Defendant contended that there is not necessarily any correlation between the "degree to which an emission reduces transmission of light" and the degree to which an emission "obscures the view of an object in the background." As we interpret the rules in question, however, the two quoted passages are merely two different ways of expressing the same concept—the degree to which an observer's view is obscured.

Defendant argues Section 2-2.1(a)(2) is "so vague and arbitrary as to violate constitutional standards controlling the validity of criminal legislation." We have previously upheld the constitutionality of an identically worded section of the Portland Air Quality Control Code. *Portland v. Fry Roofing Co.,* supra.

To distinguish our prior decision, defendant now centers his constitutional attack on the concept of "equivalent opacity," discussed above. Defendant states this argument as follows:

"* * * The evidence is undisputed * * * that

transmission of light and background visibility are not related factors * * * and that 'equivalent opacity' considers only obscuration of background visibility. In short, equivalent opacity measures only one factor of a definition which requires that two be considered."

■ Legislative action is always supported by a strong presumption of constitutionality, and that presumption extends to decisions of administrative bodies exercising legislative powers. *Pacific States Co. v. White,* 296 US 176, 56 S Ct 159, 80 L Ed 138, 101 ALR 853 (1935); *Pacific Tel. & Tel. Co. v. Wallace,* 158 Or 210, 75 P2d 942 (1938). Administrative rules, like statutes, should be interpreted, if possible, in such a way as to sustain their constitutionality. *Pacific States Co. v. White,* supra; *State v. Combs,* 169 Or 566, 130 P2d 947 (1942). As discussed above, we interpret CWAPA's definition of opacity, that is, reduction of transmitted light and obscuration of background, as stating the same concept in two ways. This seems to have been the agency's clear intent. As so interpreted, we hold the agency rules, including the concept of equivalent opacity upon which they are based, to be constitutional.[9]

### Was the State's Main Evidence Admissible?

The evidence that defendant violated Section 2-2.1(a)(2) consisted of the testimony and field reports

---

[9] Defendant also argues CWAPA's rules are unconstitutional because there is no rational relationship between the attempt to regulate the degree to which smoke obscures an observer's view of the background and the legitimate state interest of abatement of air pollution. Defendant seems to be claiming there is no community interest in protecting visibility through the atmosphere around his plant or that air pollution codes cannot constitutionally be concerned with esthetic matters. We deem this contention too frivolous to merit discussion.

of two smoke readers employed by CWAPA, Mr. Bispham and Mr. McDonald, who had monitored the plume coming from the smokestack at defendant's plant. Defendant assigns as error the admission of this evidence, arguing it was incompetent because the two smoke readers did not possess sufficient qualifications to testify concerning obscuration of background caused by the emissions from defendant's plant. Also, as a related point, defendant argues their testimony was insufficient to sustain the convictions.

In C-56168 Mr. Bispham testified concerning observations on July 29 and August 6, 1969, and Mr. McDonald testified concerning observations on July 30 and August 4, 1969. In C-56867 Mr. Bispham testified about his smoke readings on all four dates involved, September 5, 10, 15 and 24, 1969. Their testimony and reports were as follows:

| Date | Minutes of Observation[6] | Minutes of Violation | Minutes 80% or More of Background Obscured[7] |
|---|---|---|---|
| July 29 | 75 | 69¾ | 67½ |
| July 30 | 75 | 75 | 73¾ |
| August 4 | 75 | 74 | 66¾ |
| August 6 | 75 | 75 | 73 |
| Sept. 5 | 75 | 54¾ | 9¾ |
| Sept. 10 | 75 | 69¾ | 24¼ |
| Sept. 15 | 75 | 73 | 19½ |
| Sept. 24 | 75 | 69½ | 28½ |

[6] It appears that the standard procedure used in taking these smoke readings was for the smoke reader to take an initial 15-minute reading, which consisted of individual readings of background obscuration every 15 seconds, in order to determine if there was a possible violation. When, on each of the dates mentioned above, there appeared to be a violation, defendant's plant manager was notified that readings would be taken for a full hour. Then the smoke readers proceeded to take individual readings every 15 seconds for a full hour.

[7] We have expressed the number of minutes during which

As we view the testimony, the two smoke readers were not offered as expert witnesses in the sense that they were asked to express opinions. Rather the question is whether they were competent to testify as to the facts of their observations of the degree to which the background was obscured by the plume of smoke at defendant's plant.

> "As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he has personal knowledge thereof, *or experience, training or education if such be required* * * *." Uniform Rules of Evidence, Rule 19. (Emphasis supplied.)

Defendant assumes, with little argument, that a witness must have special training before he can testify about background obscuration. However, in another air pollution case involving this same charge, we noted:

> " '* * * Surely it needs no expertise for * * * anyone * * * to know that one can see half or less of the West Hills, Mt. Hood, or St. John's Bridge because of the presence of a plume of smoke * * *.' " *Portland v. Fry Roofing Co.*, 3 Or App 352, 357-58, 472 P2d 826, 829, Sup Ct *review denied* (1970).

---

smoke from defendant's plant obscured 80 per cent or more of the background in order to show the extent of violations in these cases. Since emissions which obscure more than 40 per cent of the background for three minutes in any hour violate the rule in question, just these periods of 80 per cent or more obscuration are sufficient to establish defendant's guilt.

The periods during which smoke from defendant's plant obscured between 40 per cent and 80 per cent of the background are not expressed in the above chart, but can be determined by subtracting the figure for "Minutes 80% or More of Background Obscured" from the figure for "Minutes of Violation" on any given date.

But even assuming that a witness must have special training before he can testify to such facts, we hold the testimony and reports of the two smoke readers were properly received in these cases.

■ When a witness must have experience, training or education before he can testify about his observations, we find no Oregon cases which define the amount of experience, training or education that is required to establish the competency of the witness. By analogy, we assume the necessary expertise in this situation would be similar to that required before an expert can express an opinion.

> "* * * The law does not require that in order to qualify as an expert the witness be better qualified than anyone else. It only requires that he have sufficient expertise to make it probable that he will aid the jury in its search for the truth * * *." *Sandow v. Weyerhaeuser Co.,* 252 Or 377, 380, 384, 449 P2d 426 (1969).

In this context as in others the trial court's determination as to whether a witness is competent will not be upset except upon a clear abuse of discretion. *Denny v. Warren,* 239 Or 401, 398 P2d 123 (1964); *State v. Herrera,* 236 Or 1, 386 P2d 448 (1963).

Mr. Bispham and Mr. McDonald received their training at the Oregon Smoke Evaluation Training School. Bispham first attended in April of 1968; McDonald first attended in December of 1968. This training consisted of a two-day course. The first day consisted of classroom instruction. Trainees are told that in order to read a plume of smoke they must stand not less than 100 feet and not more than a quarter of a mile from the stack, must stand at right angles to the plume, must generally have the sun at their backs, and

must look for a contrasting background toward which to make their readings.

The second day involved field work learning to read smoke. The school uses a smoke generator that can be controlled to produce various densities of smoke. An instrument monitors the degree to which the smoke obscures the background. Trainees are tested for proficiency in evaluating background obscuration by comparing their readings with the instrument measurements. To be certified as a smoke reader, the trainee must achieve 90 per cent accuracy reading 75 different plumes of smoke.

In addition, CWAPA smoke readers are recertified every six months, which generally consists of again passing the same tests necessary to be originally certified. Mr. Bispham was last recertified in July of 1969, shortly before he made the smoke readings involved in these cases. Mr. McDonald was recertified in June of 1969, also shortly before he made the readings involved in these cases.

Defendant's attack on the qualifications of Mr. Bispham and Mr. McDonald centers on the variables which he claims can affect the reading of a plume of smoke. Defendant contends the two smoke readers were inadequately trained as to these variables.

Expert witnesses for the defense described these variables as including, for example, the direction from which the plume is viewed, the location of the sun in relation to the plume, weather conditions, the nature and distance of the background which the viewer attempts to observe through the plume, the diameter of the stack, the velocity of the smoke, and the type, color and size of particles in the smoke. The essence

of this testimony was that the same plume of smoke could be in compliance with CWAPA's rules when viewed from a given angle, and in violation from another; or identical plumes could be approved on one day, but condemned on another.

We perceive several shortcomings with defendant's expert testimony. First, much of the experts' discussion of these variables related to how the appearance of the plume would vary, not how the amount of background visible through the plume would vary. Second, one of the experts testified that these variables would influence the transmission of light through the plume, but as discussed above the CWAPA rule in question really prohibits obscuring of the background above permissible limits.

Most significantly, defendant's expert testimony was quite general in nature. The field reports prepared by Mr. Bispham and Mr. McDonald contained information about some of the conditions during their readings at defendant's plant, such as the time of day, cloud cover, wind velocity, their distance from the stack, and the type of background they viewed through the plume. Defendant's experts did not attempt to relate their testimony about variables that can possibly affect background visibility to the specific conditions Bispham and McDonald encountered on the days in question; instead, defendant's thesis at trial appears to have been that smoke readers trained at the Oregon school are incompetent as a matter of law to testify concerning readings of any plume of smoke other than perhaps the one that comes from the smoke generator at the school.

For example, one of defendant's experts testified that a smoke reader would get different results

reading the same plume when he was looking toward the sun as opposed to when the sun was at his back. However, since the evidence established that the sun was generally behind Bispham and McDonald during all of their readings, we fail to understand the relevance of the expert's testimony to the facts of these cases, especially since he testified that a smoke reader would perceive a lesser degree of background obscuration with the sun at his back.

Expert witnesses for the state agreed that some, but not all, of the variables described by the defendant's witnesses can have an effect on the reading of a plume of smoke. However, they substantially discounted the impact these variables would have. In essence, their testimony was that if smoke readers followed the instructions they were given at the smoke school their readings in the field would be accurate. These witnesses also testified that during a smoke reader's certification and recertification he would be exposed to some of the variables at the smoke school, *e.g.,* as the sun moved during the day, as the cloud cover and weather conditions changed during the day, as the reader looked toward a variety of different backgrounds, etc.

■ As to the several variables we have discussed to this point, we cannot say on this record that the trial judges abused their discretion by admitting the evidence of Mr. Bispham's and Mr. McDonald's smoke readings. *Denny v. Warren,* supra.

We have not yet mentioned one of the relevant variables, the "wet plumes" problem, because we believe it requires separate consideration.

As noted above, CWAPA's rules forbid emis-

sions that obscure 40 per cent or more of the background. The rules further provide that the 40 per cent limitation

"* * * shall not apply where the presence of uncombined water is the only reason for the failure of an emission to meet [it] * * *." Section 2-2.1 (a)(3).

The evidence is uncontroverted that the plume at defendant's plant was a "wet plume," i.e., that the emission coming from the stack included water droplets.

The evidence is also uncontroverted that the generator at the smoke school is incapable of producing a wet plume, and thus CWAPA's smoke readers have no practical training in reading a wet plume. It appears, however, that the smoke readers were instructed: (1) to read a wet plume at a point beyond which all the visible water had evaporated; (2) the rate of evaporation would be slower as the relative humidity rose; and (3) not to attempt to read a wet plume when the relative humidity was over 70 per cent.

Bispham and McDonald testified they read defendant's plume at a point beyond the "steam dissipation line." This was described as a point in the plume at which there was a perceptible change in color. The two smoke readers testified that other unidentified smoke readers had pointed out steam dissipation lines to them while working in the field, and had explained that beyond that point the plume no longer contained any visible water.

Expert witnesses for both parties, other than Bispham and McDonald, tended to agree there could

be such a perceptible change in color, but none of them could cite any scientific foundation for the state's claim that beyond that point there was no longer any visible water in the plume.

The training CWAPA gives its smoke readers as to wet plumes may well not be optimum, and this presents a close question concerning the admissibility of Bispham's and McDonald's testimony. Since they testified that defendant's plume obscured 80 per cent or more of the background (or, in other words, more than twice the amount of background obscuration to constitute a violation), and since there was no showing that the amount of visible water in defendant's plume could have such a substantial impact on their readings, we resolve this close question in favor of the state. We agree with both trial judges in their conclusion that the variables revealed by these records go to the weight and not the admissibility of Bispham's and McDonald's testimony.

### Was the State's Evidence Sufficient?

■ Defendant argues that even if the evidence from Bispham and McDonald passes the test for admissibility, it does not pass the separate tests for being sufficient to be submitted to the trier of facts and sufficient to sustain these convictions. Defendant correctly states that "[g]uilt cannot be proved by speculation." *State v. Long,* 243 Or 561, 566, 415 P2d 171 (1966) ; *see also, State v. Christenson,* 5 Or App 335, 483 P2d 84, 5 Or App 335, 484 P2d 853, Sup Ct *review denied* (1971).

When the sufficiency of the evidence to sustain a verdict is challenged, it is not the reviewing court's

function to reexamine the evidence but only to decide whether there is any evidence sufficient to sustain it. *State v. Nipper,* 1 Or App 540, 464 P2d 835 (1970). On a trial to the court without a jury the trial court's judgment is the same as a jury verdict and will stand unless the appellate court can say that there is no evidence to sustain it. *City of Oakland v. Moore,* 1 Or App 80, 83, 457 P2d 659, Sup Ct *review denied* (1969).

We conclude that the evidence was sufficient to create a jury question in both cases. The ultimate question in both trials became how much weight to give to the testimony of the smoke readers. There was conflicting expert testimony on the accuracy and reliability of the smoke readings made by Bispham and McDonald; the resolution of which group of experts to believe rested with the trier of fact.

Moreover, records which reveal background obscuration of more than 80 per cent contain sufficient evidence to sustain convictions for violation of a rule that prohibits more than 40 per cent background obscuration.

### Was it Mandatory for CWAPA to Follow and Exhaust Administrative Procedures Before Instituting Criminal Prosecutions?

Defendant's third contention is that: (1) CWAPA failed to follow enforcement procedures set forth in the statutes and its own rules; (2) these procedures are prerequisites to prosecution for violations of Section 2-2.1(a)(2) of CWAPA's rules and ORS 449.990(19); and (3) therefore, the prosecutions in this case were "premature" and the convictions must be set aside.

To discuss this contention, it is necessary first

to briefly describe the structure of the various agencies charged with the responsibility of policing air pollution.

General statewide authority to control air pollution is vested in the Department of Environmental Quality.[9] See generally ORS 449.702 to 449.845. (Most but not all of these statutes were in effect at the time of the alleged violations in this case.)

In addition, the 1967 legislative session provided for the creation of regional air quality control authorities. Oregon Laws 1967, ch 425, codified as ORS 449.850 to 449.920. Regional authorities are generally subordinate to the Department of Environmental Quality, have many of the same powers as the department, but exercise those powers over a more limited geographic area. Some of the statutory powers and duties of the Department of Environmental Quality are expressly made applicable to regional authorities, see ORS 449.855(2), but others are not. Pursuant to this 1967 legislation, on January 1, 1968, CWAPA was duly created as the regional air quality control authority with jurisdiction over the metropolitan Portland area.

Against this background, we turn to defendant's argument concerning possible violations of statutes and agency rules, which breaks down into three subpoints.

Both statutes and agency rules provide for conciliation between CWAPA and air polluters. Defendant argues these conciliation procedures are mandatory and that they were not followed in this case.

---

[9] Before July 1, 1969, the effective date of Oregon Laws 1969, ch 593, this authority was vested in the state Sanitary Authority.

At the time of the prosecutions the relevant statutes provided:

"The program for the control of air pollution * * * shall be undertaken in a progressive manner, and each of its successive objectives shall be sought to be accomplished by a maximum of cooperation and conciliation among all the parties concerned." ORS 449.765(2).

"The department [of Environmental Quality] shall:

"(1) Encourage voluntary cooperation by all persons concerned in controlling air pollution and air contamination." ORS 449.781(1).[9]

"(1) In case any written substantiated complaint shall be filed with the Environmental Quality Commission which it has cause to believe, or in case the commission itself has cause to believe, that any person is violating any rule, regulation or order which was promulgated by the commission by causing or permitting air pollution or air contamination, the Environmental Quality Commission shall cause an investigation thereof to be made. If it shall find after such investigation that such a violation of any rule, regulation or order of the commission exists, it shall by conference, conciliation and persuasion endeavor to the fullest extent possible to eliminate the source or cause of the air pollution or air contamination which resulted in such violation." ORS 449.815(1).[10]

The relevant CWAPA rules provided:

"* * * The program of this Authority for the control of air pollution shall be undertaken in a

---

[9] The above-quoted terms of ORS 449.781 are expressly applicable to regional air quality control authorities, such as CWAPA. ORS 449.855(2).

[10] Defendant argues this section is applicable to regional air quality control authorities, such as CWAPA, but we fail to find anything in the statutes that so provides. However, for present purposes we will assume it is applicable to CWAPA.

progressive manner, and each of its successive objectives shall be sought to be accomplished by cooperation and conciliation among all the parties concerned." Section 1-1.1.

"The Program Director shall seek compliance with the air quality standards of these rules by cooperation and conciliation among all the parties concerned. * * *" Section 1-2.1(b)(1).

Assuming without deciding that these statutes and rules concerning conciliation are mandatory prerequisites to any possible criminal prosecutions for air pollution violations,[1] there was sufficient evidence in both cases from which the finder of fact could conclude that CWAPA discharged its duty to attempt conciliation with defendant before the present indictments were returned.

The record in C-56867 establishes the following: On September 23, 1968, CWAPA sent defendant a letter asking defendant to submit a proposed compliance schedule. Defendant did not reply. There was a formal conference between CWAPA personnel and representatives from defendant on January 19, 1968, and informal contacts, i.e., through correspondence and some meetings, between the parties continued after that date up to and after the return of the indictments

---

[1] The above-quoted statutes and rules concerning conciliation could be interpreted as directory, not mandatory, in form. Such an interpretation might follow from: (1) an analysis of the statutes which would make any duty to negotiate with air polluters secondary and subordinate to the primary policy to maintain "the quality of the air resources of the state in a condition as free from air pollution as is practicable," ORS 449.765(1)(a); and (2) an analysis of the entire statutory scheme of Oregon's air pollution legislation as expressing a legislative intent to grant substantial flexibility to the state and regional administrative agencies charged with the important responsibility of regulating air pollution. These two lines of analysis are more fully developed above.

in these cases. Defendant proposed installing pollution control devices referred to in the record as the "Fort Lauderdale system," the "Detroit system," and the "Minneapolis system." CWAPA's technical staff felt defendant's proposals were not adequate to bring defendant into compliance with CWAPA's rules; defendant was informed of this evaluation. CWAPA officials advised defendant they believed certain control devices would produce compliance. These are referred to in the record as a "low voltage electrostatic precipitator," a "venturi scriber on high energy input," and a "fume incineration system."

As a separate development, between February 26, 1969, and June 18, 1969, CWAPA sent defendant 11 letters notifying defendant of 24 violations of CWAPA's air pollution rules.

Additional evidence of CWAPA's efforts at conciliation was presented by way of the minutes of the meetings of CWAPA's board of directors. The minutes of the August 23, 1968, meeting state:

"Mr. Crofoot [CWAPA general counsel] recently reviewed recent actions with Fry Roofing Company, including the fact that the Board had previously given authorization for judicial action under the City of Portland Air Quality Control Code before the Columbia-Willamette Air Pollution Authority Rules had been adopted. He recommended that the Board now authorize judicial action be taken under the Columbia-Willamette Air Pollution Authority Rules if a Schedule for Compliance is not signed by Fry Roofing Company within fifteen days. Mr. Crofoot added that the staff does not feel the plan for control proposed by Fry Roofing Company will bring the plant into compliance.

"Mr. Herbert Anderson, attorney for Fry Roof-

ing Company, briefly described the process for control they are proposing and stated they felt that it would meet an opacity standard of less than No. 2 \* \* \*.

"Mr. Anderson stated that Fry Roofing Company would like to delay this matter for thirty days \* \* \*. During this thirty days, an attempt will be made to work out a Schedule for Compliance Agreement with Fry Roofing Company.

"Commissioner Glossenger moved and Commissioner Grayson seconded that the staff be given authority to proceed with enforcement by judicial action under Authority Rules if Fry Roofing Company does not enter into a Compliance Agreement within Thirty days and the provisions of the Agreement are not met. The roll was called and all commissioners present voted aye."

The minutes of the January 31, 1969, meeting state:

"Mr. Crofoot reported that any action on the part of Fry Roofing Company to bring their operation into compliance with the Rules of the Authority has apparently ceased. He recommended to the Board that they hold an administrative hearing to get the history of proceedings with this company on file and attempt to show for the record that the company does not have a definite or active plan to control the emissions from their Portland Plant. "\* \* \* \* \*

"After some discussions, the Board agreed to hold an administrative hearing, if so desired by Mr. Hatchard and Mr. Crofoot, to further the long-time efforts to bring Fry Roofing Company into compliance with the Rules of the Authority."

And the minutes of the March 28, 1969, meeting state:

"Mr. Crofoot, legal counsel, reviewed the judicial processes available which could be used to bring Fry Roofing Company into compliance with the Rules of the Authority. This company has been

operating in violation of the State and local regulations for many years despite legal attempts to bring them into compliance.

"After considerable discussion, Commissioner Stefani moved, and Commissioner Grayson seconded, and the motion carried to instruct legal counsel to proceed with consultation with Multnomah County District Attorney concerning Grand Jury action for Fry Roofing Company violations."

The record in C-56168 includes some but not all of same evidence. In that trial, however, the state's efforts to establish the details of the negotiations between CWAPA and defendant were cut off by defendant's objections that such matters were "irrelevant." Nevertheless, the record in C-56168 also contains sufficient evidence for the finder of fact to conclude CWAPA has discharged any duty it has to conciliate as a prerequisite to criminal prosecution. In the alternative, if the record in C-56168 is inadequate in this matter, the fault rests with defendant; it would be anomalous to allow defendant to argue on appeal that the state failed to prove a given point when it was defendant's own objections to the relevance of the evidence that prevented such a record from being built.

Both statutes and CWAPA rules provide for administrative hearings, with notice and opportunity to be heard, that can lead to agency orders to abate air pollution. Defendant argues such an administrative hearing is an essential prerequisite to a criminal prosecution. It is admitted that there were no such administrative proceedings involving defendant prior to the dates of these indictments.

The relevant statutes provide:

"In case of failure by conference, conciliation,

and persuasion to correct or remedy any source or cause of any air pollution or air contamination which resulted in a violation of any rule, regulation or order of the Environmental Quality Commission, the commission shall have cause to have issued and served upon the person complained against, a written notice, * * * [which] shall require the person so complained against to answer the charges of such complaint at a public hearing before the commission * * *." ORS 449.815(2).[⊛]

"After hearing, the board of directors of a regional authority may enter an order against a party to enforce any rule." ORS 449.895(1).

The relevant CWAPA rule provides:

"In case of failure by conference to correct air pollution or air contamination which has resulted in a violation of any rule or order of the Authority, the Authority may institute a hearing by written notice issued and served upon the person complained against." Section 1-4.3(a).

■ We do not agree that the administrative proceedings contemplated by these statutes and rules are essential prerequisites to criminal prosecutions. The statutes and rules are all phrased in a permissive manner: "* * * the commission *shall have cause to have issued* * * * a written notice," ORS 449.815(2) (emphasis supplied); "[a]fter hearing, the board of directors * * * *may* enter an order," ORS 449.895(1) (emphasis supplied); "* * * the Authority *may* institute a hearing," Section 1-4.3(a) (emphasis supplied).

---

[⊛] Defendant argues this section is applicable to regional air quality control authorities, such as CWAPA, but we fail to find anything in the statutes that so provides. However, for present purposes, we will assume it is applicable to CWAPA. See also, footnote 10.

In addition, ORS 449.800, which defines the powers of the Environmental Quality Commission, with the same powers also having been granted to regional authorities, ORS 449.855(2), makes it clear that the agencies have the authority either to proceed against air polluters by way of administrative hearings, ORS 449.800(2) and (3), or by way of criminal proceedings, ORS 449.800(4). This same concept is expressed in the penalty statute which is the basis of the present prosecutions:

> "Violation of any rule adopted pursuant to ORS 449.875 *or* any final order of a regional air quality authority entered under ORS 449.895 is a misdemeanor * * *" ORS 449.990 (19).[20] (Emphasis supplied.)

The intention of the legislature to provide a separation between the civil and criminal methods of enforcement of these statutes is further borne out by the fact that the legislature saw fit to enact ORS 449.993 which authorizes the Department of Environmental Quality or a regional air quality control authority to impose civil penalties for violations of provisions enforced by such agencies.

■ This analysis of the statutes is consistent with the entire statutory scheme in this field. The primary goal of all of Oregon's air pollution legislation is:

> "(1) In the interest of the public health and welfare of the people, it is declared to be the public policy of the State of Oregon:

> "(a) To restore and maintain the quality of the air resources of the state in a condition as free from air pollution as is practicable, consistent with

---

[20] This provision has since been renumbered, and is now codified as ORS 449.990(20).

the overall public welfare of the state." ORS 449.765(1)(a).[⑭]

We interpret the scheme of the legislation designed to achieve this goal as expressing a legislative intent to allow flexibility to the state and regional administrative agencies charged with the important responsibility of regulating air pollution. These agencies are expected to respond to the facts of each individual situation as their best judgment indicates is appropriate, based on their administrative expertise. Thus, whether to attempt to achieve the primary goal of our air pollution legislation, ORS 449.765(1)(a), in any given situation by way of an administrative hearing or by way of referring the matter to the district attorney for prosecution, is for the agency to decide. We do not believe the legislature intended to straitjacket the agencies into the requirement of a perhaps protracted administrative proceeding in each and every case.[⑮]

Defendant contends CWAPA failed to follow provisions of its own rules which allow a reasonable time for compliance with the agency's air purity

---

[⑭] Before August 22, 1969, the effective date of Oregon Laws 1969, ch 216, § 2, this statute read:

"(1) In the interest of the public health and welfare of the people, it is declared to be the public policy of the State of Oregon:

"(a) To maintain such a reasonable degree of purity of the air resources of the state to the end that the least possible injury should be done to human, plant or animal life or to property and to maintain public enjoyment of the state's natural resources and consistent with the economic and industrial well-being of the state."

We do not consider this change in language to be of any significance for present purposes.

[⑮] Perhaps the same could be said of the conciliation requirement in the statutes and rules. See, footnote 11.

standards. These rules (Section 2-4.2, Schedule for Compliance) state:

"(a) A reasonable time for compliance with these rules shall be allowed by the Program Director to any person who will not be in compliance with these rules on the effective date, or to any person found by the Program Director at a later date not in compliance. Time for compliance shall include each of the following: time for engineering, time for procurement, time for fabrication and time for installation and adjustment.

"(b) Persons responsible for emissions which will not be in compliance with these rules on their effective date, or persons responsible for emissions found by the Program Director at a later date not in compliance, shall submit to the Program Director for approval a schedule for compliance containing estimates of times as specified in subsection (a) of this section. A request to amend the original schedule for compliance may be submitted within 90 days of the original request providing that material facts are submitted in writing indicating a different reasonable schedule is required for compliance.

"(c) If a person who has been given such reasonable time for compliance fails either (1) to comply with these rules by the time specified, or (2) to make reasonable progress toward completion, at any phase, of such installations as are required for final compliance, the Program Director may require of such person such further reports as he deems necessary to show reasonable progress toward compliance. The Program Director may, if he finds unreasonable delay, proceed in accordance with the enforcement procedures contained in these rules."

It is axiomatic that an administrative agency must follow its own regulations. *Carnation Co. v. Dept. of Agriculture,* 7 Or App 223, 488 P2d 1385 (1971), Sup Ct *review denied* (1972). It is, however, clear that CWAPA did not establish a schedule for compliance with defendant before these prosecutions were initiated. This presents, we believe, defendant's most substantial argument for reversal of the convictions in this case. Yet, perplexingly, the state has ignored this issue in its brief in this court.

■ It is, however, apparent from the review of the record in C-56867 that the trial judge was satisfied that CWAPA's rules regarding a schedule for compliance did not prevent convictions because of the last sentence, which reads:

"* * * The Program Director may, if he finds unreasonable delay, proceed in accordance with the enforcement procedures contained in these rules." Section 2-4.2(c).

The enforcement procedures referred to include criminal prosecutions. We agree with the trial judge.

In C-56867 the program director testified that both he and CWAPA's board of directors formed the opinion that defendant was unreasonably delaying its efforts to comply with CWAPA's air purity standards before criminal proceedings were initiated. Specifically, the program director testified:

"[THE COURT]: Did you, at any time during the year, 1969, make any finding of unreasonable delay?

"THE WITNESS: Yes, Your Honor * * *."

When recalled to the stand he testified further:

"[DISTRICT ATTORNEY]: At the time that you and Mr. Crofoot went to the Board in order to

determine which of the two courses of action should be taken, either administrative hearing or criminal action, were you, as Program Director, at that time of the opinion that there had been an unreasonable delay?

"* * * * * *

"THE WITNESS: Yes."

The minutes of the meeting of CWAPA's board of directors referred to in the last question state:

"Mr. Crofoot, legal counsel, reviewed the judicial processes available which could be used to bring Fry Roofing Company into compliance with the Rules of the Authority. This company has been operating in violation of the State and local regulations for many years despite legal attempts to bring them into compliance.

"After considerable discussion, Commissioner Stefani moved, Commissioner Grayson seconded, and the motion carried to instruct legal counsel to proceed with consultation with Multnomah County District Attorney concerning Grand Jury action for Fry Roofing Company violations."

The program director's and board's conclusions that defendant was unreasonably delaying its efforts to comply with CWAPA's air purity standards were supported by substantial evidence, most of which has already been discussed. Under these circumstances Section 2-4.2 of CWAPA's rules does not bar the present prosecutions.[10]

### Were the Court's Instructions in Error?

Lastly, defendant contends that the court in C-56168 erred (a) in failing to instruct on the elements

[10] See State v. Arizona Mines Supply Co., 107 Ariz 199, 484 P2d 619, 623 (1971), which distinguishes and holds inapplicable St. Regis Paper Co. v. State, 237 So 2d 797 (Fla App 1970), also heavily relied upon by defendant herein.

of the crime and (b) in giving instruction allowing the jury to convict on the basis of the statutory presumption of intent.

The gist of defendant's first contention here is that defendant was entitled to an instruction that willful misconduct must be shown to be the proximate cause of the violation charged in the indictment, citing ORS 449.825, which reads:

"The several liabilities which may be imposed pursuant to ORS 449.702 to 449.717, 449.760 to 449.830 and 449.850 to 449.920 upon persons violating the provisions of any rule, regulation or order of the Environmental Quality Commission, shall not be so construed as to include any violation which was caused by an act of God, war, strife, riot or other condition as to which any negligence or wilful misconduct on the part of such person was not the proximate cause."

■ We disagree with defendant's interpretation of the above section. The intent and purpose of ORS 449.825 is simply to excuse a violator from prosecution on account of a violation which resulted from an independent, intervening cause such as an act of God, war, strife, riot or other similar cause.

ORS 449.990(19) (now codified as ORS 449.990 (20)) does not require allegation and proof of willful misconduct as the proximate cause of the violation. The indictment alleges that the acts of pollution charged were done "wilfully." ORS 161.010 defines "wilfully" as follows:

"As used in the statutes relating to crimes and criminal procedure, unless the context requires otherwise:

"(1) 'Wilfully,' when applied to the intent with which an act is done or omitted, implies simply a

purpose or willingness to commit the act or omission referred to, and does not require any intent to violate law, to injure another or to acquire any advantage.

"* * * * * *."

As we pointed out in *State v. Sinniger*, 6 Or App 145, 149, 486 P2d 1303, Sup Ct *review denied* (1971):

"In statutory crimes, unless there is incorporated into the legislative definition the element of intent on the part of defendant, the intent with which the act was done is not an ingredient of the offense. State v. Brown, 73 Or 325, 144 P 444 (1914)."

The above statute requires no greater intent than the words of the offense carry. This is what the indictment alleged and that is all that is required. *See, State v. Arizona Mines Supply Co.*, 107 Ariz 199, 484 P2d 619, 627 (1971).

Defendant's second contention that the trial judge erred in giving instructions allowing the jury to convict on the basis of the statutory presumption of intent was not properly preserved in the lower court and will therefore not be considered for the first time on appeal. *State v. Jorgensen*, 8 Or App 1, 492 P2d 312 (1971) Sup Ct *review denied* (1972).

Defendant's other assignments are likewise without merit.

In summary we are of the opinion that both trial judges correctly assessed the evidence concerning defendant's alleged violations and properly interpreted the applicable statutes and regulations.

Affirmed.