**LLOYD A. FRY ROOFING CO., Appellant,**

v.

**STATE of Texas, Appellee.**

No. 18970.

Court of Civil Appeals of Texas, Dallas.

Aug. 12, 1976.

Rehearing Denied Sept. 16, 1976.

Jack Pew, Jr., D. L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellant.

John L. Hill, Atty. Gen., W. Thomas Buckle, Asst. Atty. Gen., Austin, for appellee.

GUITTARD, Justice.

This appeal is taken from a temporary injunction restraining the operator of a plant manufacturing asphalt shingles from violating the regulation of the Texas Air Control Board limiting opacity of emissions into the atmosphere. The temporary injunction was granted after this court had

reversed a final judgment in favor of the State for injunctive relief and statutory penalties under the Texas Clean Air Act, Tex.Rev.Civ.Stat.Ann. art. 4477-5 (Vernon Supp.1974), and had remanded the cause for further proceedings. *Lloyd A. Fry Roofing Co. v. State,* 524 S.W.2d 313 (Tex.Civ.App. —Dallas 1975, writ ref'd n. r. e.). On this appeal the defendant contends that the trial court abused its discretion in granting the temporary injunction because (1) there is no evidence of defendant's violation of the regulation, (2) the temporary injunction is not sufficiently specific under Tex.R.Civ.P. 683, and (3) the regulation itself is too vague to give notice of the conduct which may be in violation. For the purpose of determining whether the trial court abused its discretion in issuing the temporary injunction, we hold that both the regulation and the injunction are sufficiently specific, so far as the present record shows, and that the evidence is sufficient to support the trial court's finding of a violation. Accordingly, we affirm the trial court's order.

### 1. *Validity of the Regulation*

All of defendant's contentions, as we view them, turn on the meaning of the term "uncombined water" as used in the Board's regulation, which directs that "uncombined water" be excluded from determinations of opacity. Consequently, we consider first the meaning of the regulation.

■ Administrative regulations are tested by the same principles of construction as statutes. *Texas Liquor Control Board v. Attic Club, Inc.,* 457 S.W.2d 41, 45 (Tex.1970), *app. dism.* 400 U.S. 986, 91 S.Ct. 459, 27 L.Ed.2d 435 (1971); *Railroad Commission v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1025 (1942). A statute is unconstitutionally vague only when a required course of conduct is stated in terms so vague that men of common intelligence cannot be sure of what is required; that is, when there is substantial risk of miscalculation by those whose acts are subject to

regulation. *Texas Liquor Control Board v. Attic Club, Inc., supra.*

Accordingly, we review the applicable provisions of the Board's regulation to determine whether its meaning is clear enough to give reasonable notice of what is required. Rule 103.1 of the regulation provides:

> No person may cause, suffer, allow or permit visible emissions from any stationary flue to exceed an opacity of 30% averaged over a 5-minute period.

This rule is modified by the following provision of rule 103.7:

> Contributions from uncombined water shall not be included in determining compliance with Rule 103. The burden of proof which establishes the applicability of Rule 103.7 shall be upon the person seeking to come within its provisions.[1]

The term "uncombined water" is not defined in the regulation or in the statute, but the regulation provides as follows:

> Unless specifically defined in the Act or in the Rules of the Board, the terms used by the Board have the meaning commonly ascribed to them in the field of air pollution control.

■ In view of this provision we must assume that "uncombined water" is used in its technical sense in the field of air pollution control, if it has a technical meaning in that field. When a term used in a statute has a peculiar or technical meaning as applied to some art, science, or trade, the court will look to the particular art, science, or trade from which it was taken in order to ascertain its meaning. *O'Hara v. Luckenbach S.S. Co.,* 269 U.S. 364, 370, 46 S.Ct. 157, 159, 70 L.Ed. 313 (1926); *Texas & N. O. R. Co. v. W. A. Kelso Building Material Co.,* 250 S.W.2d 426, 430 (Tex.Civ.App.—Galveston 1952, writ ref'd n. r. e.). If such a technical term is not defined in the statute, courts have interpreted the statutes in the light of the testimony of expert witnesses familiar with the particular art, science, or

---

1. The effectiveness of this provision concerning the burden of proof is challenged by defendant. We do not reach this point, since we assume that the burden of proof is on the State to establish that its opacity readings excluded "uncombined water."

trade. *See Order of Railway Conductors v. Swan,* 329 U.S. 520, 525–28, 67 S.Ct. 405, 408, 91 L.Ed. 471 (1947); *Texas Alcoholic Beverage Commission v. Major Brands of Texas, Inc.,* 492 S.W.2d 616, 620 (Tex.Civ. App.—Austin 1973, no writ).

■ We cannot take judicial notice of the technical meaning of "uncombined water" in the specialized field of air pollution control. Therefore, in accordance with the above authorities, we must construe the term in the light of the record in this case. In this process we are aided by a presumption that the regulation is valid. A statute is presumed to be valid and the burden is on the party asserting its invalidity. *Texas State Board of Barber Examiners v. Beaumont Barber College, Inc.,* 454 S.W.2d 729, 732 (Tex.1970). The same presumption is applied to administrative regulations. *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 87 S.W.2d 1069, 1070 (1935); *State v. Lloyd A. Fry Roofing Co.,* 9 Or.App. 189, 495 P.2d 751, 754 (1972).

We conclude that defendant has not discharged its burden to establish invalidity of the regulation. Mere absence of a definition of "uncombined water" in the regulation does not establish that the term is impermissibly vague. Only those terms whose meaning is not otherwise clear require definition. Neither is impermissible vagueness shown by the evidence in this case. The only testimony casting doubt on the meaning is that of defendant's witness Morris Key, an analytic chemist and consultant in the environmental field. He did not testify concerning the meaning of "uncombined water" in the field of air pollution control. He said that in the field of chemistry the term "combined" has a well-known meaning, that is, when two substances combine they form a third substance with properties dissimilar to the individual components, as hydrogen and oxygen combine to form water. He testified that the emissions from defendant's plant contain asphalt or hydrocarbon particles around which water has condensed, and that the water so condensed is "uncombined" in the chemical sense, although it is physically "adsorbed" to the asphalt nucleus. In his opinion, such "adsorbed" water does not evaporate as quickly as condensed water droplets containing no such nuclei, and thus does not form a definite line of demarcation easily detectable by an opacity observer. When asked whether the process of "adsorption," which he had described, was a "physical combination of water with asphalt particles," he testified that it was "not a combination in the sense of my training." He added, however, "When you start talking physical combinations you are outside the realm of my experience." From this testimony the inference may be drawn that Mr. Key would not venture an opinion as to the meaning of the term outside the field of chemistry. He gave no testimony concerning the meaning of the term in the field of air pollution control, nor did he assert that the term was not well understood in that field.

The only direct testimony on the meaning of the term in the field of air pollution control is that of Dean Wolbach, the Board's Chief of Methods Evaluation Group for Source Surveillance. Dr. Wolbach holds a Ph.D. degree in organic chemistry and has received special training in various aspects of air pollution sampling and abatement. He testified that he knew of no confusion concerning the definition of the term "uncombined water" in the field of air pollution. He said that in the scientific field as it relates to opacity observation, "uncombined water is water that has condensed, become visible in what we call layman's steam." According to Dr. Wolbach, if there is such "layman's steam" present in the "plume" emitted from a stack, there is a clear-cut demarcation where the plume of steam disappears, and observers should read the plume beyond that point for the purpose of determining the opacity of the emissions. Other witnesses for the State, who were trained and certified by the Board as opacity observers, testified that they could easily determine whether a plume contained uncombined water by observing it and looking for a definite line of demarcation where the condensed water or "layman's steam" dissipates.

Some corroboration of this testimony was provided by defendant's witnesses. Cynthia Placko testified that she had seen "steam plumes," which were very white and dense and were soon dispersed into the air. R. L. Chaffin testified that it is easy to determine a line of demarcation when steam coming out of a stack condenses on hitting the outside air and then quickly dissipates, but difficult when moisture is emitted in the form of "condensed water."

■ Since the Board's regulation expressly provides that terms not specifically defined should "have the meaning commonly ascribed to them in the field of air pollution control," and since Dr. Wolbach was the only witness to testify concerning the meaning of "uncombined water" as commonly understood in that field, we conclude that defendant has not overcome the presumption of validity of the regulation. Consequently, we hold that the trial court could properly determine for the purpose of issuing a temporary injunction that the term was well understood in that field and was sufficiently definite to give reasonable notice of its meaning.

■ In view of Dr. Wolbach's testimony that "uncombined water" in rule 103.7 means condensed water which is visible in the plume and quickly dissipates at an easily observable point, it follows that moisture which does not so dissipate because of its attachment by "adsorption" to an asphalt nucleus is not "uncombined water" within rule 103.7, although it may not have formed a combination with the nucleus in a chemical sense.

■ This interpretation is supported by the Board's administrative construction of its regulation. Besides Dr. Wolbach, the three opacity observers who appeared as witnesses for the State testified that in their training by the Board, they were instructed to exclude uncombined water from their observations of opacity by reading the plume beyond the point at which visible moisture dissipates, and that they had no difficulty in doing so. Defendant's witness Key acknowledged that he was so instruct-

ed. This interpretation by the agency charged with enforcement of the regulation is entitled to weight in the courts. *Calvert v. Kadane,* 427 S.W.2d 605, 608 (Tex.1968). The administrative construction is apparently well known in Texas in the field of air pollution control, since the record shows that all certified opacity observers receive the Board's course of instruction before certification.

■ Defendant contends that if "uncombined water" is interpreted as applying only to "layman's steam," which is quickly dissipated and easily recognizable, the regulation is discriminatory because it does not exclude other forms of moisture. We see no discrimination in this respect. No problem arises with respect to invisible water vapor because the opacity regulation applies only to visible emissions. With respect to "adsorbed moisture," if defendant is correct in its theory that when moisture condenses around nuclei composed of other materials it is not dissipated at a clear line of demarcation, the Board may properly consider such moisture as being in a category different from that of moisture which is not combined in the physical sense with other material. Moreover, as we shall show hereafter, the evidence in this case would support an implied finding by the trial court that no such "adsorbed" moisture was present in the emissions from defendant's plant. Consequently, defendant has no standing to challenge the regulation on the ground of discrimination.

■ Defendant also asserts invalidity of the regulation on the ground that the Board's method of determining opacity by visual observation is inherently inaccurate and is so recognized by the Board in allowing in its tests of certified observers the margin of error of fifteen percent for an individual reading and seven and one-half percent for an average of fifty readings. Defendant asserts that this margin puts it at the unbridled mercy of the Board's representatives, who may make their determinations arbitrarily and without reference to any definite standard. We are not persuaded that the allowance of this margin of

error gives the Board's observers unlimited discretion. The evidence shows that certified observers must not only receive the Board's course of instruction and pass its tests, but that they also must be tested and recertified for each six months' period. There is also evidence that although the readings of certified observers are subject to some variation, experience has shown such variations to be less than five percent.

The allowed margin of error might raise a serious question if the charge of violation of the regulation were based on opacity readings exceeding the permitted thirty percent by less than the amount of the margin. On the other hand, the allowance of this margin of error presents no problem when the opacity readings are in excess of fifty percent, as were those of the State's witnesses in this record.

■ Defendant attacks the regulation on the further ground that its operations are subject to the unlimited discretion of the Board's observers, since their observations are subjective and defendant has no notice of the times when such observations are to be made. On the former appeal we held that lack of notice was not a denial of due process because defendant was not left without rebutting evidence and observations without prior notice were necessary for detection of violations. Tex.Civ.App., 524 S.W.2d 313, 318. We adhere to that holding. We now hold that similar considerations apply to defendant's contention of unlimited discretion on the part of the Board's observers. Defendant presented the testimony of three certified observers, none of whom testified that the Board's observation methods were inherently unreliable, and there is no evidence in the record tending to show that the State's observers were arbitrary or capricious in making or recording their observations. One of defendant's witnesses, R. L. Chaffin, testified to opacity readings at the lip of the stack in the same range as those of the State's witnesses and differed with them only as to whether the plume at that point contained "uncombined water." Like the State's witness, Chaffin found no definite line of de-

marcation where the condensed moisture dissipated, but he assumed that "uncombined water" was present, and he made other readings farther downstream. The correctness of that assumption, rather than the reliability of the Board's method of observation, was the main issue at the temporary injunction hearing.

■ Similar attacks on the visual observation method of determining opacity were made by defendant and rejected by the Oregon Court of Appeals. *State v. Lloyd A. Fry Roofing Co.*, 9 Or.App. 189, 495 P.2d 751, 754–58 (1972); *City of Portland v. Lloyd A. Fry Roofing Co.*, 472 P.2d 826 (Or.App.1970). We conclude that in this case also defendant has not shown the Board's method of determining opacity to be so subjective and arbitrary as to establish that the trial court abused its discretion in granting the temporary injunction.

### 2. *Validity of the Injunction*

Like reasoning applies to defendant's attack on the trial court's order for lack of specificity. Tex.R.Civ.P. 683 requires that an order granting an injunction "shall be specific in terms" and "shall describe in reasonable detail . . . the act or acts sought to be restrained." The order in question restrains defendant from "permitting visible emissions . . . from exceeding an opacity of 30% averaged over a five-minute period as determined by trained visible emissions evaluators certified by the Texas Air Control Board." It further provides that in determining compliance with this limitation "contributions from uncombined water shall not be included."

■ Insofar as defendant contends that the order lacks specificity because of its use of the term "uncombined water," we disagree because we hold in view of the evidence in this case that the term is sufficiently specific. Insofar as defendant contends that the order is impermissibly vague in providing that opacity shall be "as determined by trained visible emissions evaluators certified by the Texas Air Control Board," we hold that the allowance of a

margin of error on the part of opacity observers does not deprive the order of the required specificity. When the purpose of the injunction is to protect the public, the test of required specificity is reasonableness, and in framing the decree doubt should be resolved against the violator. *Davies v. Unauthorized Practice Committee*, 431 S.W.2d 590, 595 (Tex.Civ. App.—Tyler 1968, writ ref'd n. r. e.). We recognize, however, that a serious question might arise on a charge of contempt for violation of the injunction if the only variation established from the thirty percent opacity permitted by the regulation is within the range of this margin of error.

### 3. *Sufficiency of Evidence*

■ In its order granting the temporary injunction the court recited its findings that defendant had operated its plant in violation of rule 103.1 of the Board's regulation "in that it has caused, suffered, allowed, or permitted visible emissions from the west stack at its Irving plant to exceed an opacity of thirty percent averaged over a five-minute period on at least the following dates: May 8, 1975; August 6, 1975; December 16, 1975; December 18, 1975; February 23, 1976; and February 24, 1976." The court further found and recited "that on these dates any effects or contributions from uncombined water were not included in determining the percent opacity of the emissions from the west stack." Defendant attacks these findings on the ground that there is no evidence that defendant has violated or will continue to violate rule 103.1 and on the ground that it is undisputed that the State's observers in determining opacity did not exclude all contributions from uncombined water, as required by rule 103.7. Our examination of the record has led us to the conclusion that there is evidence to support these findings.

Defendant manufactures shingles by coating felt paper with asphalt and other materials and then cutting to the size desired. The felt comes in rolls containing an average of eight percent moisture by weight. Before immersion of the felt in tanks of hot asphalt, the moisture is driven off by spraying one side with asphalt at a temperature of 450° Fahrenheit. This moisture, together with minute particles of asphalt and other hydrocarbons, collects in a hood and is vented above the building in a flue or stack. According to defendant's witnesses, the temperature at the top of the hood is 200° and that at the top of the stack is 110° to 145°.

It is undisputed that substantial amounts of moisture are emitted from the stack. Defendant argues that since the State's observers made no allowance for this moisture in their readings, there is no evidence of any violation of the regulations. The issue is whether this moisture is emitted in visible form as "uncombined water," which, according to the Board's regulation, should not be included in the determination of opacity, or in the form of invisible water vapor, which contributes no opacity. The State takes the position that the moisture is invisible as emitted from the stack. Accordingly, the State's witnesses testified to opacity readings immediately above the lip of the stack ranging from forty-nine percent to seventy-one percent. They saw no definite line of demarcation where the moisture dissipated and, accordingly, concluded that the plume contained no "uncombined water" that affected their readings.

Defendant's witnesses did not make their observations at the same time as the State's witnesses, since defendant had no notice when the State's observations would be made. Defendant's witnesses Placko and Key testified that they read the plume at the lip of the stack. Their opacity readings ranged from nineteen percent to thirty percent. Key testified that the opacity was greater in the morning when the temperature was lower and the relative humidity higher. Neither of these witnesses attempted to determine a point where the visible moisture dissipated. Defendant's witness Chaffin, on the other hand, testified that he attempted to read the plume beyond the point at which the visible moisture dissipated, but had difficulty doing so since

he saw no definite line of demarcation. He read the plume five to six diameters downstream and reported readings of ten percent to thirteen percent opacity, but his readings at the lip of the stack ranged from eleven percent to sixty-one percent. According to Chaffin, it is easy to determine a line of demarcation when moisture is emitted in the form of steam which condenses on striking the outside air, but almost impossible to do so when the moisture is emitted in the form of "condensed water." Chaffin did not say whether he was referring to "condensed water" containing nuclei of asphalt or other particles. To some extent, Chaffin's testimony corroborates the testimony of the State's witnesses in that he saw no definite line of demarcation where the visible moisture dissipates, and some of his readings at the lip of the stack were well in excess of thirty percent.

None of the witnesses testified that moisture was being emitted in the form of steam in the sense of water vapor at a temperature above the boiling point, and none testified that condensation was taking place after the moisture was emitted from the stack. The dispute was whether the moisture emitted was in the form of visible condensed droplets or whether it was emitted as invisible water vapor such as that normally present in the atmosphere and measured in terms of humidity. Defendant offered evidence that by weight the emissions contained 97.2 or 97.3 percent water to 2.8 or 2.7 percent particulate matter, but these figures shed no light on the question of whether the water is visible or invisible.

The State's witness, Dr. Wolbach, testified that he had investigated the operations at the plant and had made a calculation showing that the dew point of the stack effluents was below the actual temperature of the exist gasses. Accordingly, he concluded that the water vapor did not condense in the stack, but was emitted in the form of invisible vapor which did not affect the opacity of the emissions. Although Dr. Wolbach said that it would "take some testing" to determine whether the water vapor so emitted was combined or uncombined, this uncertainty apparently did not affect his opinion that the moisture was not being emitted in visible form.

The only testimony tending to show that the emissions from the stack contained water in visible form was that of defendant's witness Key, although his own observations of the emissions at the lip of the stack produced opacity readings within the permitted thirty percent. We have already noted his opinion that before the moisture is emitted from the stack it condenses around particles of asphalt or other hydrocarbons which form nuclei to which the water is "adsorbed," though not chemically combined, and that droplets emitted in this form do not dissipate so rapidly as to form an easily observed line of demarcation. On cross-examination, however, Key admitted that "adsorption" does not take place in substantial amounts unless the temperature is below the dew point and that the effluent gasses must be saturated with moisture before "adsorption" of substantial amounts of moisture will take place. He recognized also that asphalt and other hydrocarbons are "hydrophobic," in that they are only slightly soluble in water, so that the condensed water is "loosely held." He gave no testimony showing that he had made any tests to determine whether such "adsorption" was actually taking place before the moisture was emitted from the stack or whether moisture so "adsorbed" would, in fact, resist evaporation to the extent that no line of dissipation would be easily observable. Thus Key's testimony was based on a theory which the trial court was not required to accept. See *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex. 1970). We must presume that the court impliedly found against this theory if such a finding is necessary to support the trial court's order.

Moreover, even if Key's theory of "adsorption" is taken as established, the trial court was not required to accept defendant's argument that water so "adsorbed" was "uncombined water" within the meaning of the Board's regulation. We have heretofore noted Dr. Wolbach's definition

of this term as condensed water vapor that is visible in the plume and dissipates at an easily observable point. If the water is so attached to particles of asphalt that it does not dissipate at an easily observable point, then, according to this definition, it is not "uncombined water" and need not be excluded from the determination of opacity.

In view of Dr. Wolbach's definition of "uncombined water," which the trial court was at liberty to accept, and in view of the State's evidence that the emissions from defendant's stack did not contain visible moisture, we hold that the evidence is sufficient to support the trial court's findings.

### 4. Effect of This Decision

For the reasons stated we overrule all of defendant's points of error and affirm the order granting the temporary injunction. We point out, however, that our decision is based on the present record and does not determine any issue that may be presented at the final trial on the merits. See Texas Foundries, Inc. v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460, 464 (1952). At that trial, the validity of the regulation and the sufficiency of the evidence to establish a violation must be determined on the basis of the evidence before the court at that time. In view of this situation, we have difficulty understanding why the trial court entertained the application for temporary injunction after this court had remanded the cause for further proceedings. The better practice would have been to set the case for an early trial on the merits. See Southwest Weather Research, Inc. v. Jones, 160 Tex. 104, 327 S.W.2d 417, 421–22 (1959). The Texas Clean Air Act expressly provides that a suit brought under it "shall be given precedence over all cases of a different nature." Tex.Rev.Civ.Stat.Ann. art. 4477–5, § 4.04(c) (Vernon Supp.1974). In view of this mandatory provision, we see no justification for hearing the application for temporary injunction and then delaying trial on the merits until after determination of the interlocutory appeal. A prompt trial on the merits would not have caused a substantial-

ly greater disruption of the docket than the hearing on the temporary injunction. We deplore the use of a temporary injunction and an interlocutory appeal to obtain determination of questions of law in advance of trial on the merits because, as above pointed out, such a decision is not binding on the merits and frequently, as in this case, the interlocutory appeal must be decided on the basis of a record, less complete than one made at a plenary trial.

Affirmed.