LLOYD A. FRY ROOFING
COMPANY, Appellant,

v.

STATE of Texas, Appellee.

No. 18559.

Court of Civil Appeals of Texas,
Dallas.

May 15, 1975.

Rehearing Denied June 5, 1975.

Jack Pew, Jr., D. L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellant.

John Hill, Atty. Gen., Troy C. Webb, Asst. Atty. Gen., Austin, for appellee.

GUITTARD, Justice.

The State of Texas sued Lloyd A. Fry Roofing Company for civil penalties and injunctive relief under the Texas Clean Air Act, Tex.Rev.Civ.Stat.Ann. art. 4477–5 (Vernon Supp.1974), for alleged violations in connection with the operation of defendant's plant for the manufacture of asphalt shingles at Irving, Texas. The petition alleges violation of the regulations of the Texas Air Control Board in two respects: (1) failure to install stack-sampling facilities on request of the Board, and (2) permitting visible emissions from defendant's plant of greater opacity than the maximum allowed by the Board's regulations. In a trial to a jury, the trial court directed a verdict against defendant on the charge of failure to install stack-sampling facilities and the only issues submitted to the jury in that respect concerned penalties for the alleged violation. Issues were also submitted concerning the alleged opacity violation. Based on the jury's answers, the court awarded penalties against defendant of $43,400 on the stack-sampling charge and $19,750 on the opacity charge and also granted injunctive relief. Defendant appeals.

With respect to the stack-sampling charge, we hold that the trial court had no jurisdiction because the request by the Board's engineer and counsel for defendant to install these facilities was not an order of the Board and did not exhaust the Board's primary jurisdiction. Accordingly, we reverse and render judgment denying any relief based on this charge. With respect to the opacity charge, we hold that the trial court had jurisdiction, that the evidence is legally sufficient to support the jury's findings that the opacity of the emissions from defendant's plant was in excess of that allowed by the Board's regulations, and that defendant was not denied due process by the Board's failure to give defendant notice concerning the times and places of taking opacity readings at defendant's plant. However, we reverse and remand for a new trial on the opacity charge because of the exclusion of certain evidence offered by defendant and because the court permitted the State to prove defendant's total assets and gross receipts on a nation-wide basis.

## I.  *The Board's Primary Jurisdiction*

■ Under authority of § 3.10(f) of the Act, the Board has adopted regulations requiring that any property owner upon request by the Board shall provide such stack-

sampling facilities "as may be necessary for the Board to determine the nature and quantity of solid particles which are or may be discharged as the results of source operation." The record shows that on May 23, 1972, one of the Board's engineers visited defendant's plant and instructed defendant to construct facilities for stack sampling, including steel platforms, steel ladders, sampling ports, and power sources, as described in three pages of specifications. On May 31, 1972, the Board's chief of legal staff wrote a letter to defendant's plant manager "officially requesting" that the facilities specified by the engineer be installed by June 26, 1972. According to evidence offered by defendant, but excluded by the court and presented to us in a bill of exception, installation of the facilities requested would require an expenditure of $12,500. The Board has never held any hearing to determine whether the facilities specified are "necessary for the Board to determine the nature and quantity of solid particles which are or may be discharged as the results of source operation," and has never made any fact finding to that effect. Neither has the Board entered any order requiring, or even requesting, defendants to install such facilities. No regulation of the Board describes the particular facilities which the Board's staff is authorized to request. On defendant's failure to install the facilities requested by the engineer and the attorney, without any further order of the Board, the State, acting through the Attorney General, filed this suit for civil penalties and injunctive relief.

We hold that the request by the Board's engineer and attorney is not a ruling, decision, or similar act of the Board which would exhaust its primary administrative jurisdiction to determine the feasibility and necessity of the stack-sampling facilities requested. Consequently, the trial court lacked jurisdiction to determine whether defendant was in violation of the Board's regulations by failing to comply with the request. This exact point has been decided

adversely to the State's contention in Lloyd A. Fry Roofing Co. v. State, 516 S.W.2d 430, 433 (Tex.Civ.App.—Amarillo 1974, writ ref'd n. r. e.). We concur in the views expressed in that opinion.

■ Defendant contends that the same considerations apply to the charge concerning the opacity of the emissions from defendant's plant. We overrule this contention because the Board's regulations establish standards applicable to the emissions in question, and no question is presented of feasibility or necessity that should first be presented to the Board. Section 4.02 of the Act authorizes the Attorney General, at the Board's request, to file suit for penalties and injunctive relief for violation of such regulations. We hold that the present suit falls within that authority in so far as penalties are sought for violation of the Board's opacity regulations.

## II. *Evidence to Support Verdict*

The evidence was undisputed that the emissions from defendant's two plant stacks, if considered on a purely visual basis, had greater opacity than the thirty-percent maximum specified by the Board's regulations. Such visual opacity, however, did not in itself establish a violation because the regulations recognize that visible emissions of water do not create an air-contamination problem unless the water is combined with other particles. Accordingly, the applicable regulation provides: "Equivalent opacity contributions from uncombined water shall not be included in determining compliance."

The principal fact dispute at the trial was whether, after excluding any opacity contributed by "uncombined water," the remaining opacity of the emissions from defendant's stacks was still in excess of that allowed by the regulations. The jury found that on twenty-five separate days the visible emissions from defendant's plant stacks were in excess of the maximum allowed.

In answer to Question Nine, the jury found that on these days the visible emissions did contain uncombined water. In answer to Question Ten, however, the jury found that when the uncombined water was excluded from the readings, the opacity was still in excess of that allowed by the regulations. Defendant contends that there is no evidence to support the jury's answer to Question Ten and, consequently, that judgment should have been rendered in its favor on the basis of the answer to Question Nine.

■ We overrule this contention because we hold that the evidence was sufficient to support the jury's answer to Question Ten. The point turns on whether the State's witnesses excluded from their readings the uncombined water which the jury found, in answer to Question Ten, to have been contained in the emissions. These readings were made by visually observing the "plume" emitted from each stack at intervals over a period of several minutes, recording the estimated percentage of opacity, and averaging the resulting figures. According to the Board's instructions concerning plumes containing steam, readings "should be taken immediately beyond the point where the steam dissipates." Although there is some uncertainty in the record as to whether "steam" is invisible water vapor or condensed droplets, the jury was at liberty to conclude from the context of the Board's instructions and from the testimony of the witnesses that the term was used to refer to water in visible form since, of course, invisible water vapor would contribute no opacity.

Five expert witnesses called by the State testified concerning their readings on the several days in question. Three of these testified that they never detected any uncombined water in the emissions from defendant's stacks. Witness Lewis testified that he read the plume "beyond the point where the steam dissipated," which, he said, was at a point no more than five feet from the stack. Witness Lightfoot testified that he was familiar with the method of determining uncombined water in a plume. That procedure, he said, was to determine whether the plume had the characteristics of a steam plume with "white steam that is dissipating," and, if so, to read just beyond the point of dissipation of the white steam plume. He testified that his readings were taken at the point where the steam, or uncombined water, had dissipated.

The readings reported by Lewis and Lightfoot, as well as by the State's other three experts, consistently exceeded the thirty-percent maximum opacity permitted by the Board's regulations. The averages reported by Lewis varied from 56.6 percent to 64.1 percent. Lightfoot's averages varied from 53.8 percent to 72.8 percent. We hold that this evidence justified the jury in finding in answer to Question Ten that, when uncombined water is excluded from the readings, the opacity was in excess of that allowed by the regulations.

Defendant also contends that when the evidence is considered in the light of the entire record, including the testimony of its own witnesses, the evidence is factually insufficient to support the jury's answer to Question Ten. We do not reach this question, since we remand the case for a new trial on grounds later to be discussed.

### III. *Right to Notice of Board's Observations*

■ The readings of the State's five expert witnesses were taken on various occasions without warning or notice. Defendant contends that this procedure denied it due process because it had no opportunity to observe the accuracy of the observations of the State's experts or to have its own experts make observations at the same time so as to enable them to present rebutting testimony. Defendant insists that since the ultimate fact issues to be decided are the opacity of the emissions at the particular times when the readings were taken, such

lack of notice leaves these issues to be decided entirely on the subjective opinions of the Board's witnesses, without any means of preserving the evidence they observed. In support of this contention, defendant cites Western Alfalfa Corp. v. Air Pollution Variance Board, 534 P.2d 796 (Colo.App. 1975).

We conclude that defendants have not been denied due process. Unlike the situation in the *Western Alfalfa* case, the defendant here had the opportunity to present rebutting evidence. Although defendant's witnesses could not testify concerning opacity of the emissions on the same days that the Board's experts made their observations, defendant had the opportunity for observations under various atmospheric conditions and under various circumstances of the operation of the plant. Indeed, a bona fide effort at compliance with the Board's regulations would seem to require such observations from time to time. Defendant's witnesses described in detail the operations of the plant and the kind and quantity of air contaminants produced. They also testified concerning the amount of moisture produced by defendant's operations and the difference in opacity of the emissions when the moisture-producing part of the operation was suspended. Defendant's evidence tended to show that the Board's expert witnesses did not fully exclude uncombined water from their readings. This evidence and the cross-examination of the Board's experts have enabled defendant to make a persuasive argument that the evidence is factually insufficient to support the jury's finding of excessive opacity, a point that we do not decide because we remand on other grounds.

Moreover, we agree with the State's argument that to require notice whenever the Board intends to make observations of defendant's emissions would seriously hinder effective enforcement of the Board's regulations and would tend to defeat the purposes of the Act. The evidence shows that emissions from defendant's plant can be varied by controlling the manufacturing process in several respects, and accordingly, that opacity of such emissions can be voluntarily reduced whenever defendant has notice that observations are to be made. Thus, effective detection of violations requires that observations be made without notice. We also agree that surprise inspections are necessary to encourage industries to police their own emissions.

Although we understand the disadvantage to defendant of allowing evidence of observations made without notice, we must weigh the governmental function involved against the private interests affected by that function. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961). After weighing these factors, we conclude that the burden on defendant to rebut this kind of evidence is not sufficiently great to justify a notice requirement that would seriously hinder detection of violations. Consequently, we conclude the defendant was not deprived of due process. This conclusion is supported by the analogous holding that the constitutional right to freedom from unreasonable searches and seizures is not violated by permitting officers to break unannounced into a suspect's home if a warning would be likely to result in destruction of evidence. Ker v. California, 374 U.S. 23, 40, 83 S.Ct. 1623, 1633, 10 L.Ed.2d 726 (1963).

## IV.  *Evidence Rulings*

### (1) *Exclusion of Records Concerning Moisture*

Defendant contends that the trial court abused its discretion in excluding defendant's production records, which were offered to show the amount of moisture discharged in its manufacturing process. These records were offered to support defendant's theory that the opacity shown by the Board's readings was largely due to

uncombined water in the emissions from defendant's stacks. They contained notations showing the percentage of moisture contained in the felt sheets used in the production process on the dates of the readings taken by the State's witnesses. Defendant's evidence showed that moisture removed from these sheets was discharged through its stacks. The only objection to these records was that they had not been disclosed by defendant's plant manager when his deposition was taken.

On taking the deposition of defendant's manager, the State's counsel asked if defendant had "any records showing the exact number of days that you were in operation." The witness answered, "I'm not sure that we would." Counsel for the State did not pursue the matter further and did not ask what records defendant kept concerning its production operations. At the trial defendant offered in evidence the records in question, and the State objected on the ground that the quoted answer on the deposition had deprived the State of these records in making its preparations for trial. Out of the presence of the jury the witness explained that he understood the inquiry to concern existence of a log showing specifically how many days the plant had been in operation rather than production records from which such information could be compiled. The witness further testified that, in response to a subpoena at the time of an earlier trial setting, he had brought with him a condensed form of the production records showing the days in which the plant was in operation, but the case was not tried on that setting, and no further request for the information was made. The court sustained the objection and excluded the production records. Counsel for defendant then moved to withdraw his announcement of ready on the ground that exclusion of these records left defendant without actual proof of the exact amounts of moisture discharged in the manufacturing process on the days when the violations were alleged to have occurred. This motion was over-

ruled, and defendant's only evidence on this matter was the testimony of its manager concerning the average moisture content of the felt sheets.

■ We conclude that the trial court erred in excluding this evidence. The record shows that the State was not actually deprived of any evidence and was not surprised by any evidence produced by defendant on matters inquired about at the deposition. The information concerning the days the plant was in operation was supplied from other sources, so that the State did not need to offer the excluded records on that point.

The State cites no authority supporting exclusion of evidence under such circumstances. It relies on Railway Express Agency v. Spain, 249 S.W.2d 644, 653 (Tex. Civ.App.—Austin 1952), *dism'd as moot*, 152 Tex. 198, 255 S.W.2d 509 (1953) in which the trial court had specifically ordered production of the excluded records. When a party refuses to obey an order for the production of evidence, the court is expressly authorized to exclude such evidence by Texas Rules of Civil Procedure, rule 170(b). We need not consider whether the records offered in this case would have been properly excluded if defendant had disobeyed an order for their production. Neither do we need to decide whether they should have been excluded if they had been offered to prove the particular matter inquired about at the deposition, namely, the number of days in which defendant's plant had been in operation. They were offered on an entirely different matter, the moisture content of the emissions, and only incidentally disclosed the information which the State had inquired about at the deposition.

■ We are not willing to hold that relevant evidence may be excluded because it has some incidental bearing on a question propounded at a deposition. The right to present evidence material to the disputed issues at a trial is so important that it should not be denied unless the offering

party has withheld relevant information that he had a clear duty to produce, and even then the evidence should not always be excluded if the rights of the opposing party can be fully protected. *See* Employers Mutual Liability Insurance Co. v. Butler, 511 S.W.2d 323 (Tex.Civ.App.—Texarkana 1974, writ ref'd n. r. e.). Discovery sanctions should not be used solely to punish an erring party. *Cf.* Ebeling v. Gawlik, 487 S.W.2d 187 (Tex.Civ.App.—Houston [1st Dist.] 1972, no writ). Consequently, we hold that the trial court abused its discretion in excluding this evidence.

### (2) *Exclusion of Chaffin's Opacity Readings*

■ To rebut the evidence of opacity readings taken by the State's experts, defendant offered readings taken by its witness Chaffin, an independent expert of defendant's own selection, who had received the same smoke-reading training which the Board provided for its own experts. Since defendant was not advised of the particular times when the State's readings were taken, defendant resorted to circumstantial evidence to show that the readings of the State's experts were inaccurate. For this purpose it offered readings taken by Chaffin at other times and under various conditions.

Chaffin's readings were recorded on forms prescribed by the Board. Some of these were admitted and others were not. Those which were admitted showed readings taken with uncombined water excluded, either because the felt-drying process in the plant had been suspended or because the witness had attempted to read the plume at the point where the uncombined water had dropped out, although he testified he had difficulty determining that point. These exhibits showed opacity percentages within the limits allowed by the regulations. Four additional forms were offered which showed readings taken without any attempt to exclude the uncombined

water, and they showed readings comparable to those of the State's experts. These readings were excluded on the State's objection that the witness had admitted that these readings contained uncombined water, which, according to the Board's regulations, should not be included in determining opacity violations.

The objection missed the point of this evidence. Defendant's principal defense was that the readings of the State's experts actually included uncombined water notwithstanding their assertions to the contrary. Defendant sought to show that exclusion of uncombined water from the readings was a difficult matter of judgment, that the percentage of opacity was in excess of the maximum allowed only when the uncombined water was not excluded, and that when readings were taken properly by excluding the uncombined water, no violation of the regulations was shown. Defendant was unable to demonstrate this point effectively without introducing the exhibits containing readings which did not exclude the uncombined water and showing their similarity to the readings of the State's experts. Consequently, we hold that this evidence was admissible and that the court erred in excluding it.

### (3) *Exclusion of Foster's Unrecorded Readings*

■ Donald Foster, defendant's director of environmental control, had been trained in smoke reading by the Department of Health, Education and Welfare. He testified outside the presence of the jury that on three occasions he took readings which showed that defendant's emissions were in compliance with the Board's regulations. The State objected to this testimony on the ground that the witness did not "record his observations immediately," as the Board's regulations provided. This objection was sustained.

We hold that the court erred in excluding the testimony on this ground. The Board's

regulations may be effective to limit the type of evidence on which it bases its charges of violation, but it cannot control the evidence to be admitted in court to rebut such charges. Foster's testimony was relevant and material. Lack of immediate recording may affect the weight of the testimony, but not its admissibility.

### (4) Evidence of Defendant's Financial Resources

Sections 4.01(c) and 4.02(a) of the Texas Clean Air Act provide a civil penalty of not less than fifty dollars nor more than one thousand dollars for each day of violation of the Act or of the Board's regulations. In asserting its claim for maximum penalties under the Act, the State alleged that defendant had total assets in excess of fifty-three million dollars and gross receipts in excess of seventy-one million dollars, and further alleged that with these resources available defendant's "flagrant and continued violation of the Board's regulations" required assessment of the penalty of one thousand dollars for each day of violation. Defendant's exceptions to this allegation were overruled.

At the trial the State offered in evidence defendant's 1973 Texas Franchise Tax Report, which showed defendant's total assets to be $53,005,529, of which assets amounting to $1,589,876 were located in Texas and also showed gross receipts in 1973 of $71,-880,361, of which $6,575,452 came from Texas. This evidence was admitted over defendant's objection that it was immaterial and was offered only to incite the jury to return a verdict based on the assets or income of defendant rather than on facts.

The jury assessed penalties of $750 per day for each day of violation found before January 1, 1974, and assessed the maximum of one thousand dollars per day for each day of violation found to have occurred after that date. These penalties aggregated $19,750.

The State does not contend that the evidence of defendant's financial resources did not affect the jury's assessment of penalties. On the contrary, the Attorney General espouses the "deep pockets" theory of recovery in this context and insists that this evidence was admissible to enable the jury to fix a penalty, within the broad range allowed by the Act, which would deter defendant and others from future violations and still would not force defendant into bankruptcy. Consequently, the question presented is whether the evidence is relevant to the issue of penalties.

We conclude that any logical relevance of defendant's total assets and gross receipts to the amount of the penalties is slight and is more than offset by its prejudicial effect. This kind of evidence is likely to divert the jury's attention from the gravity of the violation and focus it on the defendant's finances. It encourages the jury to fix maximum penalties against a large industrial enterprise and to let a small operator escape with the minimum, regardless of the nature of the violation or its effect on the community. Even though some kind of information concerning defendant's financial situation might conceivably be material, we do not see the relevance of the value of defendant's assets generally or its receipts from operations at other locations. If the operation at Irving is marginal, a relatively small penalty might be sufficient to deter future violations. On the other hand, even if defendant had no operations elsewhere, a substantial profit at Irving might permit defendant to absorb a relatively high penalty or pass it on to its customers. Moreover, the value of defendant's assets does not accurately show its wealth without evidence of liabilities. Neither does the amount of its gross receipts establish whether the business was operating at a profit or at a loss. Although defendant could offer evidence in rebuttal on these matters, we do not think it should be required to do so. Evidence of defendant's general financial

condition is remote from the issues and should not be presented to the jury in the absence of other evidence showing its relevance to the particular violation charged. Wealth in itself is not material in assessing penalties. The rich as well as the poor are entitled to equal justice under the law.[1]

We do not hold, however, that no evidence concerning defendant's economic circumstances would be admissible. A different question would be presented, for instance, if evidence were offered of defendant's revenues from the particular plant in question and the profits resulting from defendant's operation of that plant in violation of the Board's regulations. Conceivably, such evidence might be relevant to show the gravity of the violation and the magnitude of the penalty necessary to deter future violations.

The State relies on authorities from other jurisdictions holding that the wealth of the defendant may be considered in assessing exemplary damages, and it criticizes Texas cases, such as Texas Public Utilities Corp. v. Edwards, 99 S.W.2d 420, 427 (Tex.Civ.App. —Austin 1936, writ dism'd) which have adopted the contrary view. We need not consider whether the same principles apply to civil penalties as to exemplary damages, since we are persuaded, for the reasons above stated, that evidence of economic factors offered to guide the jury's assessment of civil penalties should be directly related to the particular violation alleged.

### (5) *Defendant's 1969 Application for Variance*

■ The court admitted over defendant's objection an application for variance which defendant filed with the Board on June 27, 1969, under § 3.21 of the Act. This application describes the emissions for which the variance is sought as a "white plume" and gives the date by which the applicant will be in compliance with the Board's regulations as "approximately one year." The application further recites:

> We are at the present time experimenting with a pilot plant at Detroit, Michigan, and we are having success with same, however it will be approximately one year from this date before we are completely satisfied that it will control fumes, odors, particulate matter & opacity.

After this document was admitted in evidence, the State called defendant's environmental-control director to the stand and asked if any pollution-control equipment had been installed at the plant after the application for variance was filed. He answered, "Not to my knowledge. It was before my time with the company."

The State argues that this document was an admission that the operation of the plant was not in compliance with the Board's regulations in 1969, and that failure of defendant to produce evidence of any difference in the operations of the plant since that time raises a presumption that the operation was unchanged.

We disagree. The application for variance was filed almost three years before any of the occasions on which violations are charged. It does not expressly admit a violation or specify any particular regulation with which defendant was not then in compliance. We are not persuaded that it should raise a presumption that defendant was in violation of the Board's opacity regulations three years later. Before such evidence is admitted, the State should, at least, be required to show that the conditions of operation were substantially the same. In the absence of such evidence, the application should have been excluded.

---

1. *Cf.* Exodus 30:15: The rich shall not give more, and the poor shall not give less than half a shekel, when they give an offering unto the Lord, to make an atonement for your souls.

*Judgment*

The judgment of the trial court for penalties and for injunctive relief for failure to provide stack-sampling facilities is reversed, and the action is dismissed with respect to that claim. The judgment for penalties and for injunctive relief for violation of the Board's opacity regulations is reversed, and the action in that respect is remanded for a new trial.