

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00157-CR

_____

THOMAS EDWARD BLANKENSHIP, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Court at Law
Hood County, Texas
Trial Court No. 52381

---

Before Sudderth, C.J.; Womack and Walker, JJ
Dissenting Opinion by Justice Walker

**DISSENTING OPINION**

While I agree with the majority that there was no evidence that the treated wood, soda cans, and bottles qualified as "heavy oils, asphaltic materials, potentially explosive materials, or chemical wastes," I disagree that there was sufficient evidence to conclude that Blankenship unlawfully burned "treated lumber." Accordingly, I respectfully dissent and would reverse the trial court's judgment.

## I. THE TECHNICAL-MEANING EXCEPTION APPLIES HERE

The majority sets forth its definition of "treated lumber" as timber or logs that have been cut into planks and have been subjected "(as a natural or manufactured article) to some process to improve the appearance, taste, usefulness, or some other quality." To arrive here, the majority employs the "plain meaning rule" of statutory construction by separating the phrase "treated lumber" into its two terms, assigning each term its isolated dictionary definition, and melding the separately-defined terms back together. *See State v. Rhine*, 297 S.W.3d 301, 310–312 (Tex. Crim. App. 2009). It then concludes that the plywood burned by Blankenship was "treated lumber" because the evidence showed that plywood generally[1] is lumber subjected to processing to improve its performance, condition, or appearance—namely by gluing thin sheets of lumber together.

---

[1] Though there was witness testimony that plywood is broadly understood to contain adhesives or glues, there was, in fact, no other evidence that *Blankenship's* plywood definitely contained glue, and there was no evidence that, if his plywood did contain glue, such glue was toxic or otherwise illegal to burn.

However, by deconstructing the whole into its parts, the majority causes the phrase "treated lumber" to lose its recognized technical meaning. Courts ordinarily construe undefined statutory words and phrases by looking to their plain meaning—as the majority did here[2]—"[b]ut when a term unknown to the law has a particular or technical meaning as applied to some art, science[,] or trade, the court will look to the particular craft in order to ascertain its proper significance." *State v. Kaiser*, 822 S.W.2d 697, 700 (Tex. App.—Fort Worth 1991, pet. ref'd); *see* Tex. Gov't Code Ann. § 311.011(b); *Clinton v State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011) ("But if those statutory terms have a technical meaning, they will be construed consistent with that

---

[2]Quoting from *Medford v. State*, the majority concludes that the technical-meaning exception to the plain-meaning rule is inapplicable here because technical terms are only those "which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where words used have a well-known common law meaning." 13 S.W.3d 769, 772 (Tex. Crim. App. 2000). But *Medford* is not such a narrow holding, which is evidenced by reading in its fuller context the language quoted by the majority:

> The canons of construction dictate that words and phrases possessing a technical meaning are generally to be considered as having been used in their technical sense. This applies to those terms which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning.

*Id.* (internal citations omitted). Thus, *Medford* establishes (1) that courts are to construe technical words and phrases using their technical sense and (2) that one possible application of the technical-meaning exception occurs when words or phrases have acquired a particular legal meaning. *Id.* It does not foreclose other possible applications of the exception, and, as I highlight below, courts have freely applied the exception to other contexts. S*ee* Tex. Gov't Code Ann. § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition *or otherwise*, shall be construed accordingly.") (emphasis added).

3

technical meaning."); *Garner v. State*, 523 S.W.3d 266, 276 (Tex. App.—Dallas 2017, no pet.) (same).

In construing technical words and phrases, we can consult appropriate trade sources, to include reference materials or expert testimony. *Kaiser*, 822 S.W.2d at 700; *see Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Examr's*, 254 S.W.3d 714, 721 (Tex. App.—Austin 2008, pet. denied) (consulting anatomy atlas to determine the meaning of "foot" in medical licensing context); *State v. Bingham*, 921 S.W.2d 494, 496 (Tex. App.—Waco 1996, pet. ref'd) (looking to medical dictionary and testimony of phlebotomist to define phrase "qualified technician"); *Lloyd A. Fry Roofing Co. v. State*, 541 S.W.2d 639, 642–43 (Tex. Civ. App.—Dallas 1976, writ ref'd n.r.e.) ("If such a technical term is not defined in the statute, courts have interpreted the statutes in the light of the testimony of expert witnesses familiar with the particular art, science, or trade."); *see also Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 62 S.W.3d 833, 836 n.2 (Tex. App.—Austin 2001, no pet.) (concluding in the public utilities context that "fuel factor" was a term of art undefined by statute and looking to substantive administrative rules to determine its technical meaning).

## II.  "TREATED LUMBER" HAS A TECHNICAL MEANING

The phrase "treated lumber" is a technical term which is understood by construction trade professionals to mean lumber that has been treated with chemicals to inhibit combustibility, rot, or decay. *See treated lumber*, McGraw-Hill Dictionary of Architecture and Construction, https://encyclopedia2.thefreedictionary.com

/treated+lumber (last visited July 5, 2022) (defining "treated lumber" as "lumber that has been treated with a preservative"); *see also* International Building Code §§ 2302.1, 2303.1.9, 2303.2 (Int'l Code Council 2014) (codified into law at Tex. Loc. Gov't Code Ann. § 214.216 and 16 Tex. Admin. Code 70.100) (defining "treated wood" as either "fire-retardant-treated wood" or "preservative-treated wood"); EPA, *Overview of Wood Preservative Chemicals*, https://www.epa.gov/ingredients-used-pesticide-products/overview-wood preservative-chemicals (last visited July 5, 2022) (explaining that the wood "treatment process" involves applying "preservative products" to control wood degradation brought on by environmental factors); *see also Craig Bettenhausen, What is pressure treated lumber, and how does it forestall decay?*, CHEMICAL AND ENGINEERING NEWS, https://cen.acs.org/business/consumer-products/What-is-pressure-treated-lumber-how-does-it-forestall-decay/100/i9 (last visited July 5, 2022) ("The basics of pressure-treated lumber are close to common knowledge: it's what you use outdoors, it often has a greenish tint at the store, and you're not supposed to burn it, because that vaporizes the chemicals that preserve it against decay.").

The testimony presented at Blankenship's trial supports that "treated lumber" has acquired such an industry-recognized definition. Cosgrove testified—as an expert in both fire investigations and the construction industry—that "[t]reated wood[,] as far as the industry standard goes[,]" is wood that "is normally treated with a copper solution that prevents any kind of rotting or deterioration of the wood." He stated that plywood is created by gluing together small sheets of wood using "some type of

5

glue product," but that most plywood "is not what would be considered treated wood." Officers Montemayor and Lane generally concurred with Cosgrove's definition of plywood, and Montemayor explicitly conceded that there was such a thing as "untreated plywood."

Further, the TCEQ regulations cited by the majority in support of its definition actually show that the regulatory scheme does *not* contemplate that plywood constitutes "treated lumber" simply because it has undergone a gluing process. In regulating solid waste emissions, the TCEQ defines "wood waste" and provides that wood waste does not include:

> Treated wood and treated wood products, including wood products that have been painted, pigment-stained, or pressure treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote, or manufactured wood products that contain adhesives or resins (e.g., plywood, particle board, flake board, and oriented strand board).

30 Tex. Admin. Code § 113.2300(41)(D).

The majority argues that this definition places adhesive-containing products such as plywood firmly within the definition of "treated wood." However, this definition clearly addresses two distinct items: (1) treated wood/treated wood products and (2) manufactured wood products. *Id.* The former is defined to include "wood products that have been painted, pigment-stained, or pressure treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote." *Id.* Then, "creosote" is followed by an "or," and "manufactured wood products" are defined as those containing adhesives and resins, such as plywood. *Id.* In other

6

words, under this definition of wood waste, plywood is used not as an example of a treated wood product but, rather, a manufactured wood product.

Similarly, the TCEQ definition of "clean lumber" provides that clean lumber "does not include wood products that have been painted, pigment-stained, or pressure-treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote, or manufactured wood products that contain adhesives or resins (e.g., plywood, particle board, flake board, and oriented strand board)." 30 Tex. Admin. Code § 113.2300(10). Again, plywood falls under the "manufactured wood products" label; not the treated lumber label. *Id.*

And, tellingly, the TCEQ—in regulating municipal waste combustion unit emissions—defines "untreated lumber" as explicitly excluding products treated with preservative chemicals but not excluding products containing adhesives, such as plywood:

> Untreated lumber--Wood or wood products that have been cut or shaped and include wet, air-dried, and kiln-dried wood products. Untreated lumber does not include wood products that have been painted, pigment-stained, or pressure-treated by compounds such as chromate copper arsenate, pentachlorophenol, and creosote.

> 30 Tex. Admin. Code § 113.2100(54).

Thus, the regulatory context supports that "treated lumber" is lumber upon which certain preservative chemicals have been applied.

## III.  THE MAJORITY DEFINITION INVITES ABSURD RESULTS

Finally, I fear that the majority's broad definition would lead to absurd results. *See Wagner v. State*, 539 S.W.3d 298, 308–09 (Tex. Crim. App. 2018) ("[W]e will apply the plain meanings of [statutory] terms unless doing so would lead to absurd results that the Legislature could not possibly have intended.").  If we adhere, as the majority holds, to the plain-language definition of "treated lumber" as wooden planks that have been subjected "to some process to improve [their] appearance, taste, usefulness, or some other quality," then citizens would be subject to criminal penalties for burning a wide-ranging and unintended number of wood products.  Any of the following otherwise untreated products would meet the majority's definition:

- lumber painted with non-toxic paint;
- two boards nailed together;
- boards cut into intricate shapes or designs;
- planks ground into sawdust for use in animal pens; or
- popsicle sticks glued together for a school project.

The legislature cannot have intended that people be criminally prosecuted for burning any of these materials.  *See id.*

## IV.  CONCLUSION

Thus, because "treated lumber" has acquired a technical meaning as lumber treated with chemicals for preservative or fire-retardant purposes and there is no evidence in the record that Blankenship's plywood was treated in this manner, and because the majority's holding would lead to absurd results, I respectfully dissent.

/s/ Brian Walker

Brian Walker
Justice

Publish

Delivered:  July 14, 2022