**GULF STATES UTILITIES COMPANY, Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellees.**

No. 3–89–051–CV.

Court of Appeals of Texas, Austin.

Jan. 17, 1990.

Rehearing Denied Feb. 28, 1990.

Barry Bishop, Clark, Thomas, Winters & Newton, Austin, for appellant.

Jim Mattox, Atty. Gen., Susan D. Bergen, Asst. Atty. Gen., Barbara Day, Law Offices of Jim Boyle, John Laakso, Austin, for appellees.

Before POWERS, CARROLL and ABOUSSIE, JJ.

POWERS, Justice.

In a statutory cause of action authorized by the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (Supp.1989), Gulf States Utilities Company sued in district court for judicial review of a final order issued by the Public Utility Commission in a contested case. Texas Administrative Procedure and Texas

Register Act (APTRA), Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 19 (Supp.1989). The district court declined to set aside the Commission order, and Gulf appeals to this Court.[1] *Id.* § 20. We will reverse the judgment and agency order, remanding the case to the Commission. *Id.* § 19(e).

## THE CONTROVERSY

Gulf is a public utility that generates, distributes, and sells electric power under PURA and the Commission's regulation. Three of Gulf's largest electric-power customers, each situated in Louisiana, determined to withdraw from the Gulf system and to generate their own electric power. To minimize the resulting loss, Gulf proposed to the three customers that they and Gulf enter into a joint venture for the production of electric power. As a part of the undertaking, Gulf agreed to sell the joint venture two of Gulf's generating units, and to buy from the joint venture surplus electric power at a negotiated price specified in the contract. Gulf has owned and used the two generating units for a number of years. The power that Gulf promised to purchase from the joint venture would enter into Gulf's general power supply for sale and distribution to Gulf's remaining customers. The parties entered into a conditional contract on the terms indicated, and Gulf reported the transaction to the Commission as required by PURA § 63.

## PURA § 63

Section 63 of PURA requires public utilities to report to the Commission any sale of certain of their assets when the total consideration exceeds $100,000.00. On receiving a report, PURA § 63 directs the Commission to investigate the transaction, with or without a public hearing, to determine whether the sale "is consistent with the public interest," taking into consideration, among other things, the reasonable value of the property and facilities. If the Commission finds the transaction is *not* in the public interest, PURA § 63 commands that the agency: (1) consider the "effect of the transaction" in any ratemaking proceeding; and (2) disallow that "effect" if it "unreasonably" affects rates or service. PURA § 63.

Thus, a proceeding under PURA § 63 is not directed at obtaining the Commission's approval of a sale of utility assets, but it may affect a utility's rates if the Commission finds the sale is not in the public interest, and if it will unreasonably affect rates or service. A Gulf rate proceeding was pending in the Commission when it issued its final order under PURA § 63 in the proceeding we now review.[2]

1. The final order results from the act of two commissioners who adopted portions of the hearing examiner's report, and the findings of fact and conclusions of law set out in that report. In some instances, the order substitutes other findings of fact and conclusions of law formulated by the two commissioners.

   The third commissioner dissented from the final order to the extent it limited Gulf to "avoided cost" in recovering in a rate proceeding any sums expended by it for power purchased from the joint venture.

   The Commission and the Office of Public Utility Counsel defend the Commission order on appeal.

2. In PURA § 37, the Legislature vested in the Commission "all authority and power of the State of Texas to insure compliance with the obligations of public utilities" set out in PURA:

   For this purpose the [Commission] is empowered to fix and regulate rates of public utilities, including rules and regulations for determining the classification of customers and services and for determining the applicability of rates.

   Unlike most actions by administrative agencies, the Commission's action in fixing the prices charged by a public utility, for its electricity, invokes eminent domain as opposed to police-power principles. The utility has, under the 14th Amendment to the Constitution of the United States, a right to have its rates set at a level that is not "confiscatory" of its property. Phrased in another way, the utility has a right to a *fair and reasonable* return on the property it has devoted to the public service. This minimum return is also the minimum return intended by the Legislature in PURA § 39(a):

   In fixing the rates of a public utility the [Commission] shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses.

   On the other hand, PURA was enacted to prevent the charging of exorbitant rates through an

Section 63 of PURA does not provide as much, in explicit terms, but the Commission has necessarily construed the statute to permit the relevant inquiries before a sale of assets is consummated. The parties do not quarrel with that interpretation.

### The Commission Order

After public hearings, the Commission determined that Gulf's sale of the generating units was generally in the public interest. The agency conditioned that finding, however, on two accounting requirements incorporated in the final order. Both refer to the manner of treating the transaction in Gulf's pending (and any future) rate proceeding. *First*, the Commission determined that it was not in the public interest for Gulf's Texas customers "to pay in excess of [Gulf's] avoided cost for purchased power from" the joint venture, and in any rate proceeding Gulf would be "limited to recovering those purchased power payments" that fell below Gulf's avoided costs. *Second*, the Commission determined that Gulf must treat as "other electric utility income" 83% of the sums Gulf receives from the joint venture in installment payments on the sale of the two generating units, and may treat as "non-utility income" the remaining 17% of such payments.

From these determinations, Gulf prosecuted its suit for judicial review of the Commission's final order. The trial court declined to reverse the order, and Gulf appealed. The parties join issue in this Court *solely* on whether the order should be reversed because the Commission erred in either of the two accounting measures imposed as conditions in the final order.

### "AVOIDED COSTS" OF PURCHASED POWER

■ The Commission's decision to limit Gulf's recovery of operating expense to "avoided costs," in any Gulf rate proceeding, rests upon the Commission's interpretation of its rule found at 16 Tex.Admin. Code § 23.66 (1989). The ultimate issue on appeal, concerning "avoided costs," is the validity of the Commission's interpretation of that rule. That issue cannot be understood, however, except in reference to the matters next to be discussed, and the parties properly have devoted large parts of their briefs to them.

### Public Utility Regulatory Policies Act of 1978

The joint venture has been designated a "qualifying facility" under federal statutory provisions and rules relating to "cogenerators" and "small power producers" of electric energy. These federal statutes and rules have the general purpose of promoting the development of alternative energy sources in an attempt to reduce the consumption of fossil fuels and to lessen our reliance on foreign energy supplies.[3]

---

abuse of monopoly power. Consequently, PURA § 38 instructs the Commission as follows:

It shall be the duty of the [Commission] to insure that every rate made, demanded, or received by any public utility ... shall be *just and reasonable.*

(Emphasis added.) Thus, the Commission's ratefixing power operates exclusively within a range of reasonableness, bounded on the one hand by the utility's constitutional right to a fair and reasonable return, and on the other hand by its customers' statutory right to rates that are not unreasonable or exorbitant.

*See generally* Pond, *The Law Governing the Fixing of Public Utility Rates: A Response to Recent Judicial and Academic Misconceptions,* 41 Admin.L.Rev. 1, 28—30 (1989).

**3.** The encouragement of cogeneration and small-power production "has come from a requirement in the [federal Act, § 210] that elec-

tric utilities purchase power produced from such facilities at their full avoided costs...." C. Phillips, *The Regulation of Public Utilities* at 442 (1988). The mandatory-purchase rule was aimed at removing one of the first of three obstacles that had prevented independent cogenerators and small-power producers from seeking to interconnect with an electric utility: "some utilities refused to purchase electrical power generated by such source or offered the cogenerator inadequate rates." Miles, *Full–Avoided Cost Pricing Under the Public Utility Regulatory Policies Act: "Just and Reasonable" to Electric Consumers?,* 69 Cornell L.Rev. 1267, 1268 (1984). The author inferred this basis for the mandatory-purchase rule from various statements made in Congress in connection with the passage of the federal Act. These referred mainly to the utilities' fear that cogeneration and small-power production posed a threat of competition to the utilities' sales of electric pow-

The federal statutory provisions were enacted as Pub.L. No. 95–617, 92 Stat. 3117 (1978) and given the name "Public Utility Regulatory Policies Act of 1978." The provisions were incorporated subsequently in various sections of 16 U.S.C. (1982 & Supp. 1989). *See generally* Miles, *Full–Avoided Cost Pricing Under the Public Utility Regulatory Policies Act: "Just and Reasonable" to Electric Consumers?*, 69 Cornell L.Rev. 1267 (1984).

The Federal Energy Regulatory·Commission administers the federal Act. Section 210(a) of the Act (16 U.S.C.A. § 824a–3(a) (1985)) requires the agency to prescribe "rules [that] *require* electric utilities to offer to ... purchase electric energy from" qualifying cogenerators and small power producers. (Emphasis added.) Section 210(b) of the Act (16 U.S.C.A. § 824a–3(b) (1985)) refers to the rates payable by electric utilities for such compulsory purchases of electric power: the rates must be just and reasonable to the utility's consumers and in the·public interest; they may not be discriminatory against the qualifying cogenerator or small producer; and any rule prescribed by the agency may not "provide for a rate which *exceeds* the incremental cost to the electric utility of alternative electric energy." *Id.* (emphasis added). Section 210(d) (16 U.S.C.A. § 824a–3(d) (1985)) defines "incremental cost of alternative electric energy:" the term means the utility's cost for "electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." *Id.* When orchestrated, these statutory provisions mandate that the Federal Energy Regulatory Commission prescribe rules that require electric utilities to buy electric power from "qualifying facilities," whether cogenerators or small-power producers, at a purchase price prescribed by the Commission that must be equal to or less than the cost the utility would incur by producing the power itself or buying the

power from another source. Hence, the term "avoided costs" refers to the official price prescribed by the Federal Energy Regulatory Commission in such cases.

The Federal Energy Regulatory Commission promulgated the rules mandated by Congress. These govern when and under what conditions electric utilities must purchase electric power from "qualifying facilities." They also govern the setting of official prices for such sales, or the "avoided cost" rate to which the parties are bound by force of the federal Act. Neither the Act nor the federal rules purport to compel the utility and "qualifying facility" to contract for the official price and no other. Indeed, the Federal Energy Regulatory Commission "intended to permit utilities and qualifying facilities to negotiate rates *different* from those prescribed in the" regulations, which "were viewed as a buttress of protection for the qualifying facility in negotiations rather than as mandatory requirements to be enforced as to all transactions." Bruder & Simonds, "State Pricing Rules for Cogenerators and Small Power Producers—Eight Basic Issues," *Electric Power, Current Issues in Regulation and Financing* (Practicing Law Institute, 1982), at 300.

### PURA § 41A

In PURA § 41A, the Legislature enacted somewhat analogous provisions dealing with transactions between electric utilities and qualifying cogenerators or small-power producers. The statute supplies a mechanism for certifying an electric utility's "avoided cost" in a particular transaction with a cogenerator or small power producer, the certified sum being included automatically in the utility's operating expenses for rate-calculation purposes in any rate proceeding that occurs while the certification is in effect.

Section 41A of PURA applies to agreements made between an electric utility and a "qualifying facility," as that term is de-

---

er. *Id.* The remaining two obstacles consisted in the charging of discriminatory rates by the utilities for certain services, and in the effect of certain State and federal laws that subjected cogenerators and small-power producers "to ple-

nary public utility regulation." *Id.* The calculation of "avoided cost" is not an easy matter. *See* Parmesano, "Avoided Cost Payments to Qualifying Facilities: Debate Goes On," Pub. Util. Fortnightly (September 17, 1987), at 34.

fined in the federal Act to include certain cogenerators and small-power producers. "*If* an electric utility and a qualifying facility enter into an agreement providing for the purchase of capacity," either may submit a copy of it to the Public Utility Commission for "certification." PURA § 41A(b) (emphasis added). On receiving a copy for that purpose, the Commission must determine within 90 days (120 days if hearings are held) whether: (1) "the payments provided for in the agreement ... are *equal to or less than* the utility's avoided costs"; and (2) the agreement contains sufficient assurances that the utility will be furnished a comparable supply of electricity in the event the qualifying facility ceases operation. PURA § 41A(d) (emphasis added). If both inquiries are answered affirmatively, the Commission must certify the agreement to be effective for 15 years unless sooner terminated by expiration of the agreement. While the certification remains in effect, the Commission is bound to "consider payments made under the agreement to be reasonable and necessary operating expenses of the electric utility," and must allow the utility "full, concurrent, and monthly recovery of the amount of the payments" required by the terms of the agreement. PURA § 41A(e) (emphasis added).

The introductory word "if" and the sense of PURA § 41A as a whole imply that the operation of the statute is conditioned upon an agreement of the kind described and its voluntary submission to the Commission by one of the parties for the certification process described in the statute. In context, the word "if" means "provided" or "in case that." *Bagnall v. Bagnall*, 148 Tex. 423, 225 S.W.2d 401, 402 (1949).

### 16 Tex.Admin.Code § 23.66 (1989)

In another part of PURA, the Legislature instructed the Commission to "make and enforce rules to encourage the economical production of electric energy by qualifying cogenerators and qualifying small power producers." PURA § 16(g). In that connection, we note that no Commission rule or order "shall be in conflict with the rulings of any federal regulatory body." PURA § 37.

The resulting Commission rule, found at 16 Tex.Admin.Code § 23.66 (1989), is entitled "Arrangements Between Qualifying Facilities and Electric Utilities." We have, in a footnote, set out those parts of § 23.66 that assist in its proper interpretation for the purposes of the present appeal.[4] The rule defines "avoided cost" in the same

---

**4.** The rule found at 16 Tex.Admin.Code § 23.66 (1989) provides as follows after setting out various definitions of words and terms found in the rule:

\* \* \* \* \* \*

(b) Scope.

(1) Applicability. This subsection ... applies to the regulation of sales and purchases between qualifying facilities and electric utilities.

(2) Negotiated rates or terms. Nothing in this subsection:

(A) shall limit the authority of any electric utility or any qualifying facility to agree to a *rate* for any purchase, or *terms* or *conditions* relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection;....

\* \* \* \* \* \*

(3) Filing of rates. All rates for sales to qualifying facilities, *contractual or otherwise,* shall be contained in the schedule of rates of the electric utility filed with the commission *in accordance with the Public Utility Regulatory Act.*

(c) Availability of electric utility system cost data.

[Each utility must file with the Commission and maintain for public inspection specified "data" that relate to matters affecting its "interconnection" with qualifying facilities, including cost "data."]

(d) Electric utility obligations.

(1) Obligation to purchase from qualifying facilities.

(A) In accordance with subsections (e)–(h) of this section, each electric utility shall purchase *any* energy and capacity that is *made available* from a qualifying facility: [directly or indirectly].

(B) Each qualifying facility shall have the option of providing firm or nonfirm power.

(C) Each electric utility shall purchase energy and capacity from a qualifying facility with a design capacity of 100kw [kilowatts] or more within 90 days after the facility notifies the utility that it is a qualifying facility, provided that the electric utility has sufficient interconnection facilities available.... If an agreement to purchase energy and capacity is not reached within 90 days after the qualifying facility notifies the utility that it is a qualifying facility, the agreement, *if and when*

manner as the federal rule, § 23.66(a), and provides among other things that "[r]ates for purchases of energy and capacity from any qualifying facility shall not exceed avoided costs," § 23.66(e)(2).

While the present controversy comes to us solely as a proceeding under PURA § 63, we believe a proper construction of § 23.66 must account for PURA § 41A, to which the rule is most directly related, and

*achieved,* shall bear a retroactive effective date for the purchase of energy (and capacity) correspondent [sic] with the 90th day following notice by the qualifying facility [of its status as such].

(D) Nothing in this rule shall be interpreted to require an [sic] utility to contract for capacity from qualifying facilities in excess of its capacity requirements,....

(E) [The meaning of this subsection is quite obscure, owing no doubt to printing errors in the Texas Administrative Code. It appears to deal with incorporating purchases from qualifying facilities in a utility's long-term planning.]

(F) A utility shall purchase capacity from qualified facilities on the basis of evaluated cost and the quality of firmness of such capacity....

(2) Obligation to sell to qualifying facilities....

(3) Obligation to interconnect.

(A) Subject to paragraph (B) of this paragraph, any electric utility shall make such interconnections with any qualifying facility within its service area as may be necessary to accomplish purchases or sales under this section....

(B) No electric utility is required to interconnect with any qualifying facility if, solely by reason of purchases or sales over the interconnection, the electric utility would become subject to regulation as a public utility under the Federal Power Act, Part II,....

(4) Transmission to other electric utilities....

(e) Rates for purchases from a qualifying facility.

(1) Rates for purchases of energy and capacity from any qualifying facility *shall be just and reasonable to the consumers* of the electric utility and *in the public interest,* and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) *Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided costs;* however, [when] the rates for purchase are based upon estimates of avoided costs over the specific term of the contract or their legally enforceable obligation, the rates for such purchases do not violate this subsection if the rates for such purchases differ from avoided costs at the time of delivery.

(3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

(4) Rates for purchases from qualifying facilities shall be in accordance with paragraph

(1)–(3) of this subsection, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.

(5) Payments by a utility to any qualifying facility, if in accordance with paragraphs (1)–(3) of this subsection, shall be considered reasonable and necessary operating expenses of that utility.

(f) Standard rates for purchases from qualifying facilities with a design capacity of 100 kilowatts or less....

(g) Rates for purchases of nonfirm power from a qualifying facility....

(h) Rates for purchases of firm power from a qualifying facility....

(i) Periods during which purchases are not required.

(1) Any electrical utility which gives notice to each affected qualifying facility to cease delivery of energy or capacity to the electric utility will not be required to purchase electric energy or capacity during any period [when such purchases] will result in costs greater than [avoided costs], provided, however, this subsection *does not override contractual obligations of the electric utility to purchase from a qualifying facility.*

(j) Rates for sales to qualifying facilities.

(k) Interconnection costs.

(1) Interconnection plan. Each utility shall establish, and make available for inspection, guidelines for assuring safe and reliable operation of interconnected qualifying facilities. It may also require an interconnection plan from the qualifying facility to facilitate qualifying facility/utility negotiations. Upon receipt of the interconnection plan, the utility shall provide the qualifying facility with a cost proposal identifying the interconnection costs and *a list of contract issues to be addressed in negotiations.*

(2) Reimbursement of interconnection costs. Each qualifying facility shall be obligated to pay any interconnection costs. The utility's methods for determining and billing interconnection costs shall be consistent and shall be applied on a nondiscriminating basis to all qualifying facility applicants for service.

(*l*) System emergencies.

\*　\*　\*　\*　\*　\*

(m) Enforcement. A proceeding to resolve a dispute between a utility and a qualifying facility arising under this section may be instituted by the filing of a petition with the commission.... The institution, conduct, and determination of the proceeding shall be in full accordance with the rules of practice and procedure of the commission.

16 Tex.Admin.Code § 23.66 (1989) (emphasis added).

the ratemaking provisions of PURA as well, primarily PURA §§ 37–41, 42, 43. We believe, as do the parties, that all of these rules bear upon the proper administration and interpretation of § 23.66, as it has been applied in this proceeding under PURA § 63. All of these statutory and rule provisions must be orchestrated and given a consistent and harmonious meaning insofar as they bear upon the same matters.

The Commission determined in its final order under PURA § 63 that the joint-venture transaction *was* consistent with the public interest. As an integral part of that determination, however, the Commission also fixed the effect the transaction would have in any proceeding in which Gulf's electric-power rates are established: Gulf may not recover, as a component of its "reasonable and necessary operating expenses" under PURA § 39(a), any sums paid the joint venture for electric power to the extent these payments exceed Gulf's "avoided costs." That is to say, in rate proceedings this component of Gulf's operating expenses will be limited to the sums Gulf saved by not producing the equivalent amount of power itself or purchasing it from a source other than the joint venture; and Gulf will be foreclosed from showing that any higher sums are "reasonable and necessary operating expenses" that Gulf would otherwise be entitled to recover by virtue of PURA § 39(a).

Gulf contends the Commission decision was arbitrary, capricious, an abuse of discretion, and affected by an error of law in this respect: the decision results solely from the Commission's erroneous conclusion that it was *bound* by its rule in 16 Tex.Admin.Code § 23.66 to limit Gulf to "avoided costs" *even if* Gulf shows in a rate proceeding that any higher sums paid the joint venture are "reasonable and necessary" under PURA § 39(a). Gulf argues that § 23.66, properly construed, mandates "avoided costs" only when an electric utility purchases electricity or capacity from a qualifying facility under the mandatory-purchase rule of 16 Tex.Admin.Code § 23.66(d)(1) (1989) which provides:

Obligation to purchase from qualifying facilities.

(A) In accordance with subsections (e)–(h) of this section, each electric utility shall purchase any energy and capacity that is made available from a qualifying facility: ....,

and when the parties contract to that end on the terms and conditions spelled out in § 23.66 for such cases.

The Commission and the Office of Public Utility Counsel reply in two basic contentions: (1) the Commission was free to interpret its own rule, denominated § 23.66, to encompass within its terms Gulf's purchases of electric energy from the joint venture, even though these purchases did not result from any obligation imposed upon Gulf by the mandatory-purchase requirement of § 23.66(d); and (2) the Commission's power to interpret § 23.66 in that fashion, to effectuate the public interest, was correct in light of the decision in *American Paper Inst., Inc. v. American Elec. Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983), where the Court held that the federal Act and regulations fixed avoided costs as the maximum rate unless the electric utility and qualifying facility agreed to a lower price.

In our view, the terms of § 23.66 provide for two kinds of contractual relations regarding sales and purchases of electric power between an electric utility and a qualifying facility. The rule makes the most detailed and explicit requirements when the contractual relations result from the mandatory-purchase requirements of § 23.66(d). Because these contracts are likely to be involuntary in their origin, the rule must and does prescribe the procedures to be followed in arriving at a contractual relationship and the basic rights and obligations of the parties: the electric utility must provide the public the "data" from which the utility's "avoided costs" and "interconnection costs" can be calculated, § 23.66(c); the utility's purchase obligations arise when the qualifying facility makes "available" any electric energy and capacity and "notifies" the utility accordingly, § 23.66(d)(1)(A), (C); the qualifying

facility may elect to provide "firm or non-firm" power, § 23.66(d)(1)(B); the utility may not be required to purchase electric power in excess of its capacity requirements, § 23.66(d)(1)(D); the utility's purchases shall be "on the basis of evaluated cost and the quality of firmness," § 23.66(d)(1)(F); the utility must provide interconnection facilities on terms specified in the rule unless the utility would thereby become subject to regulation under the Federal Power Act, § 23.66(e); and so forth.

The rule also contemplates contractual relations established by terms and conditions *outside* the rule and its detailed provisions concerning the rights and obligations of the parties. This is plainly evident in § 23.66(b)(2)(A) where the rule declares that *nothing* in it "shall limit the authority" of either party "to agree to a *rate ...* or *terms* or *conditions ...* which differ from [those] that would otherwise be required by" the rule. (Emphasis added.) Contracts between the parties may be prompted originally by the mandatory-purchase requirements of the rule, but culminate in terms that vary from those specified in § 23.66. We imagine, moreover, that the parties may elect to include in their contract, in such instances, provisions much like those spelled out in the rule for cases where the parties cannot agree on their respective rights and obligations. The fact remains, however, that *the rule explicitly provides that the parties may contract on "terms" and "conditions" that differ from those prescribed in the rule.* More importantly, § 23.66(b)(2)(A) *also provides explicitly that the parties may contract for "a rate ... which [differs] from the rate ... that would otherwise be required by"* the rule. This provision, we believe, suggests the single reasonable meaning possible to be assigned § 23.66(e), the key provision in dispute in this appeal.

Subsection 23.66(e) governs the rates payable by an electric utility for its purchases from qualifying facilities. Indeed, it dictates what those rates shall be. Any interpretation of that subsection must *accommodate* the right of the parties to agree to a rate that differs from the rate that would otherwise be required by the rule—a right explicitly recognized and preserved in § 23.66(b)(2)(A). With this basic principle of construction in mind, we quote in summary form the text of § 23.66(e):

(1) The rates charged a "qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying" facilities.

(2) "Rates for purchases ... from any qualifying facility shall not exceed avoided costs; ...."

(3) "Rates for purchases satisfy the requirements of [subsection 1] if they equal avoided cost."

(4) "Rates for purchases from qualifying facilities shall [conform to subsections] (1)–(3) ..., regardless of whether the electric utility ... is simultaneously making sales to the qualifying facility."

(5) "Payments by a utility to any qualifying facility, if in accordance with [subsections] (1)–(3) ..., shall be considered reasonable and necessary operating expenses of that utility."

We believe these provisions provide for the two eventualities possible to arise when an electric utility purchases electric power from a qualifying facility. *Firstly,* the parties may fail to agree on any rate, in which case the rate may not exceed "avoided cost" and, indeed, the rate is fixed to equal "avoided cost" simply by force of § 23.66(e)(2), (3). In such a case, the resulting rate automatically satisfies the requirement of subsection (1) that the rate be just and reasonable to consumers, in the public interest, and non-discriminatory against qualifying facilities. Consequently, the "avoided cost" rate may be certified *in a PURA § 41A proceeding* without further inquiry as to whether it is a reasonable and necessary operating expense. *Secondly,* the parties may agree to a rate that is more or less than "avoided cost," as § 23.66(b)(2)(A) explicitly permits them to do for reasons each regards as sufficient. In such a case, an independent inquiry

must be made to determine if the rate is just and reasonable to consumers, in the public interest, and non-discriminatory against qualifying facilities, as subsection (1) requires.

Whether the rates are fixed by operation of the rule under the first eventuality, or whether they are fixed by the parties and the Commission finds they satisfy subsection § 23.66(e)(1), the resulting payments "shall be considered reasonable and necessary operating expenses" as directed in subsection (5) of § 23.66(e). If the agreed rate is lower than "avoided cost," however, it may be submitted for certification under PURA § 41A.

The foregoing is implied by the text of § 23.66(e), and the text itself rejects the Commission's interpretation. For example, the text cannot possibly contemplate a rate that is *always equal to or less than avoided cost*, because there would be in that case no need to specify in subsection (1) that the rate must be "just and reasonable" to consumers, in the public interest, and not discriminatory against qualifying facilities. The Commission's interpretation becomes positively unreasonable, however, when one considers that it renders entirely meaningless § 23.66(b)(2)(A), declaring that nothing in the rule limits the parties' authority to agree to a rate that differs from the rate "that would otherwise be re-

quired" *by the rule.* The meaning assigned by the Commission to § 23.66(e) *does* limit the parties' power to agree to another rate.

Section 23.66(e)(2) states quite explicitly that "[r]ates for purchases of energy and capacity from any qualifying facility shall not exceed avoided costs...." May the Commission therefore *construe* § 23.66(e) as setting the maximum rate that an electric utility may pay for electric power supplied by a qualifying facility, notwithstanding that this: (1) subverts the contracting parties' statutory right, under § 23.66(b)(2)(A), to agree to some other rate; and (2) renders superfluous § 23.66(e)(1) requiring rates that are just and reasonable, in the public interest, and non-discriminatory against qualifying facilities? The Commission and the Office of Public Utility Counsel contend the Commission was free to assign that meaning to § 23.66, notwithstanding the resulting anomalies, under the agency's general power to interpret its own rules. *Lloyd A. Fry Roofing Co. v. State*, 541 S.W.2d 639, 544 (Tex.Civ.App.1976, writ ref'd n.r.e.) The Commission's power to interpret its own rules is obvious.[5] The issue is not the existence of the power but the validity of its exercise in this instance. Specifically, the issue is whether the Commission may by "interpretation" or "construction" *ap-*

---

5. An administrative agency has unquestionably the power to interpret its own rules, and its interpretation of its legislative rules is entitled to great weight and deference by a court called upon to interpret or apply such rules. *Lloyd A. Fry Roofing Co. v. State*, 541 S.W.2d 639 (Tex. Civ.App.1976, writ ref'd n.r.e.). Indeed, the Commission's interpretation of its rule becomes a part of the rule itself. *Sunset Express, Inc. v. Gulf, C. & S.F. Ry. Co.*, 154 S.W.2d 860 (Tex.Civ. App.1941, writ ref'd). This does not mean, however, that on judicial review a court is bound absolutely to the *meaning* assigned by an agency to its rule. That idea is rejected by the very proposition that a court is obliged to give *deference* to the agency's interpretation, especially when the rule involves technical aspects or matters of administration peculiarly within the agency realm. The obligatory deference does not extend to agency interpretations that are plainly erroneous or inconsistent with the text of a rule. *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). This exception exists for two basic reasons.

Firstly, "[t]he courts must preserve the equal protection of the laws, even when those laws are administered by administrative boards." *Railroad Comm'n v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022, 1027–28 (1942). An agency would exercise unbounded and unshackled discretion in applying its rule if it were free to assign the rule a meaning the text could not reasonably bear, and then apply that meaning to a party subject to the agency's power. Secondly, the courts must, when called upon in a proper case, restrain administrative agencies from exceeding their power. *Shell Oil Co.*, 161 S.W.2d at 1027–28. An agency's power to prescribe rules to implement a statute extends only to carrying into effect the will of the Legislature as expressed in the statute. The agency may not, therefore, adopt a rule out of harmony with the statute. *Harrington v. Railroad Comm'n*, 375 S.W.2d 892 (Tex.1964). If the agency's interpretation of its rule places the rule out of harmony with the statute, of which the interpretation is an integral part, it is the court's duty to strike down the agency interpretation as ultra vires of the agency's powers.

*ply the rule to circumstances that are not included in the text of the rule by any reasonable inference from that text.*

We think it beyond doubt that the Commission intended its rule (§ 23.66) to have the *force and effect of law.* Indeed, the Commission's position in the case rests on that premise. The rule is denominated a "substantive rule" by the Commission, and the rule clearly affects individual rights or obligations to the extent it applies. It is therefore a "legislative" as opposed to an "interpretative" or "procedural" rule. *See generally General Electric Credit Corp. v. Smail,* 584 S.W.2d 690 (Tex.1979); *B–R Dredging Co. v. Rodriguez,* 564 S.W.2d 693 (Tex.1978); Schwartz, Administrative Law § 4.1.1, at 158–59 (1984); Davis, Administrative Law Text § 4.6, at 126; 1 Cooper, State Administrative Law Ch. VII, at 175–76 (1965). As such, the *text* of the rule carries in and of itself an authoritative force *which binds* alike the *agency, affected persons, and the courts, just as a statute would do. See, e.g., Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976); *Texarkana & Ft. S. Ry. Co. v. Houston Gas & Fuel Co.,* 121 Tex. 594, 51 S.W.2d 284, 287 (1932). Consequently, the text of the rule must be construed under the same principles as if it were a statute. *Lewis,* 540 S.W.2d at 310. This does not mean, however, that the agency's *construction* of its rule invariably binds the courts. The agency's construction is controlling *"unless* it is plainly erroneous or inconsistent with the regulation" or rule. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977) (*quoting Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)) (emphasis added). The exceptional circumstance applies in the present case where the Commission has unreasonably extended the scope of its rule beyond the limits of what the text reasonably permits.

We need not discuss that matter further, however, for it is obvious that the Commission's construction of its rule cannot stand for more fundamental reasons. Any construction placed by the Commission upon § 23.66 becomes a part of the rule itself. *Texarkana & Ft. S. Ry. Co.,* 51 S.W.2d at

287. When the Commission's construction is engrafted upon § 23.66, the rule contradicts the clearly expressed intent of the Legislature in PURA § 39(a) (an electric-utility rate must permit recovery of "reasonable and necessary operating expenses"), PURA § 43(c) (the Commission may only disallow certain enumerated expenses of a utility and any other expenses that it *determines* are "unreasonable, unnecessary, or not in the public interest"), and PURA § 41A (*if* a utility and qualifying facility contract for a rate at or below avoided cost, they may have it certified by the Commission in which case the cost automatically constitutes "reasonable and necessary operating expenses" that the utility is entitled to recover monthly). The Commission's construction cannot stand because the validity of § 23.66 depends upon its being *in harmony with those statutory provisions and purposes. Texas Liquor Control Bd. v. Attic Club, Inc.,* 457 S.W.2d 41, 45 (1970). Section 23.66 falls out of harmony with those statutory provisions and purposes *if* the rule is construed to permit *only* a contract rate at or below "avoided cost," any difference being outside and irrelevant to the statutory methods and standards (PURA §§ 37–41, 42–43) prescribed by the legislature for the fixing of Gulf's rates. *See Railroad Comm'n v. Entex, Inc.,* 599 S.W.2d 292, 295–96 (Tex. 1980) (rates may range only between maximum allowed by PURA § 40 and minimum fixed by PURA § 39).

We hold the Commission gave § 23.66(e) a construction that is unreasonable under the text of that provision and out of harmony with the pertinent statutory provisions and purposes. We must therefore reverse the agency order on the grounds claimed by Gulf: that the decision was arbitrary, capricious, an abuse of discretion, and affected by an error of law.

We should refer briefly to *American Paper,* upon which the Commission and the Office of Public Utility Counsel rely. The Court held in *American Paper* that the Federal Energy Regulatory Commission did not act arbitrarily or capriciously in promulgating a rule that set the contract rate at "full avoided cost," or "the maximum rate that the Commission *may pre-*

*scribe."* 461 U.S. at 413, 103 S.Ct. at 1927 (emphasis added). The Court did *not* have before it a case where, as here, the *parties* contracted for a rate *higher* than the official rate prescribed by the Commission. Thus, the decision furnishes no guidance in our consideration of the present case.

## ALLOCATION OF FIXED–ASSET PAYMENTS

■ Gulf's contract with the joint venture required that the venture pay Gulf the purchase price of the two generating units in 20 annual installments of $6.35 million each. The aggregate of such payments, reduced in value to the time of the agency hearing, was about $51 million, a "gain" of $48 million over the $6 million net original cost of the two units.[6]

The examiner recommended, and the Commission ordered, that Gulf's rate proceedings must account for a division of the annual payments in the following manner:

> The just compensation safeguarded to the utility by the 14th Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. And rates not sufficient to yield that return are confiscatory. Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses including the expense of depreciation is the company's compensation for the use of its property....
>
> Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience [nor any interest] in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock....
>
> *Bd. of Pub. Util. Comm'nrs v. New York Telephone Co.,* 271 U.S. 23, 31–32, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926) (Citations omitted).
>
> The fiction represents, nevertheless, a regulatory device for coping with the possibility that a utility might manipulate its affairs, accounts, and property in such a way that its customers are ultimately forced to pay rates that are actually more than "just and reasonable." This possibility is referred to in the text of our opinion. The fiction may also reflect, less persuasively, a naked *a priori* presumption in favor of ratepayers, as demonstrated in *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786 (D.C.Cir.1973). *See* McCrea, *Awarding In–Service Appreciation to Public Utility Ratepayers—Windfall or Perdition?,* 11 Cal.W.L.Rev. 160 (1974).

**6.** The sale of a fixed asset ordinarily removes it, of course, from the utility's "rate base," or the aggregate of the net depreciated cost of all its assets "used and useful in rendering service to the public." PURA § 39(a). By thus reducing the "rate base," the sale automatically benefits the utility's customers because a "reasonable return" would not be payable on the asset and any operating and maintenance expenses associated with the asset would not be incurred after its removal from public service.

For one reason or another, the sale of the asset may bring a price in excess of the net depreciated cost at which it had been carried in the utility's accounts. The "net depreciated cost" is the remainder of the original cost of the asset after making deduction for the accumulated depreciation taken against it by the utility while it formed a component of the "rate base." *See* PURA § 41(a) (requiring that rates be based upon the original cost of property "less depreciation."). The accumulated depreciation taken against the original cost of an asset is the total of the sums charged against the asset periodically, as "operating expenses" under PURA § 39(a), while it was yet in the public service. *See* 16 Tex.Admin.Code § 23.21(b)(1)(B) (1989) (depreciation expense must ordinarily be based upon original cost and computed on a straight-line basis, however "[o]ther methods of nonaccelerated depreciation may be used for electric generating units when it is determined that such depreciation methodology is a more equitable means of recovering the cost of the plant."). When the sale of an asset does bring a sum in excess of its net depreciated cost, the resulting "gain" may be claimed for the benefit of the utility's customers on a rationale that they have "paid" for the asset to the extent of the accumulated depreciation, because the sums taken as depreciation had the effect of elevating the utility's expenses and increasing thereby the rates paid by the customers. In other words, had depreciation not been taken, the utility's expenses would have been commensurately less, and the customers' rates lower to the same extent.

The foregoing rationale depends, of course, upon the grossest fiction in its premise that the ratepayers have "paid" for the asset. The literal effects are different:

83% of such payments must be assigned to "other electric utility income," thereby reducing the sums necessary to be recovered from ratepayers in order to produce "overall revenues" sufficient to permit Gulf "a reasonable opportunity to earn a reasonable return on its invested capital ... over and above its reasonable and necessary operating expenses," in the words of PURA § 39(a); and the remaining 17% may be assigned to "non-utility income" where it would not enter at all into the rate calculations required by PURA.[7]

The foregoing division and allocation of the $48 million "gain" appear to constitute a departure from ordinary Commission requirements in accounting for "gains" on the sale of depreciable property that formerly constituted a part of the "rate base" because it was devoted to public service. The Commission's rules require regulated public utilities, such as Gulf, to keep a "uniform system of accounts as adopted and amended by the Federal Power Commission." 16 Tex.Admin.Code § 23.12(a)(2)(B)(i) (1989). Under this system of accounts, the $48 million evidently would have been assigned *in its entirety* to "non-utility income." *See* 18 C.F.R. Part 101 at 351 (1989) (rules of the Federal Energy Regulatory Commission, to which certain regulatory functions of the Federal Power Commission were transferred in 42 U.S.C.A. § 7172 (1983)); *see also, Washington Pub. Interest Org. v. Public Serv. Comm'n,* 393 A.2d 71, 83 (D.C.1978). But the federal rule requires such accounting treatment only in the ordinary case, that is to say, "[u]nless otherwise authorized by the Commission...." 18 C.F.R. Part 101 at 351 (1989). Because the Public Utility Commission expressly adopted the federal government's uniform system of accounts, we believe the Commission reserved the same flexibility: for rate-calculation pur-

poses the uniform system of accounts should not bind the Commission absolutely when depreciable property is involved. *See, Washington Pub. Interest Org.,* 393 A.2d at 83.

The assignment of 83% of the annual payments to "other utility income" results in a benefit to Gulf's ratepayers by reducing their required contribution (through rate payments) to the requisite level of "overall revenues" specified in PURA § 39(a)—a level that permits Gulf "a reasonable opportunity to earn a reasonable return on its invested capital" devoted to public service. Viewed from the ratepayers' standpoint, the inclusion of all the annual payments in "non-utility income" would result in their subsidizing Gulf's non-utility operations by their rate payments because those payments had been calculated in the past partly on the basis of a depreciation expense allowed Gulf on the two generating units. In a figurative sense, ratepayers "paid" for the two units in the past by their indirect contribution to Gulf's recovery of its depreciation expense.

Viewed from Gulf's standpoint, the Commission's order requires the company to subsidize its customers' purchase of electric power by unnaturally or artificially elevating the company's "other utility income," the "gain" on the sale of the two units being primarily the result of an increase in their market value due to economic "inflation."

The Commission justified assigning 83% of the annual payments to "other utility income" on a basis set out in a part of the hearing examiner's report expressly adopted by the agency, referring to the testimony of two witnesses. The part so adopted recites:

> Dr. Andersen testified that because 83 percent of the original cost of these units

---

We do not deal in the present case with the sale of non-depreciable property such as land. Consequently, our opinion should not be understood as referring to a transaction of that character.

**7.** In PURA § 41(c), the Legislature defined "net income" to account for "all reasonable and necessary expenses" as determined by the Commission under rules laid down in the subsection.

One such rule excluded "any expenditure found by the regulatory authority to be unreasonable, unnecessary, or not in the public interest...." PURA § 41(c)(3)(D) Excluded expenses cannot enter the rate calculation and, in effect, must be borne by the utility. *Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 441 (Tex.1987).

had been recovered from the ratepayers, no less than 83 percent of any gain realized from the sale of these units should accrue to the ratepayers by booking 83 percent of the annual capital charge, (*i.e.* the fixed asset payment) above rather than below the line. (Entries above the line impact the ratepayers, while entries below the line do not.) Similarly, Mr. Bellon testified that because [Gulf] and the shareholders have recovered approximately 83 percent of the costs related to [the two units], the ratepayers should receive 83 percent of the fixed asset payment [Gulf] receives from the sale of the units. In addition, Dr. Andersen recommended that the remaining 17 percent of gain be split evenly between [Gulf's] ratepayers and shareholders, with the ratepayers' portion being booked above the line.

Gulf contends the 83%—17% division and allocation for rate purposes is arbitrary, capricious, an abuse of discretion, at odds with established legal principles, and unsupported by substantial evidence.

Gulf thus raises one of the more complicated issues in public-utility law: when and to what extent may a regulatory body, as a condition to some favorable action requested of it by a regulated utility, extract from the utility a share of the "gain" over original cost that the utility has realized in the sale of a fixed asset formerly included in the rate base, the extracted sum being applied to the benefit of ratepayers in the form of lower rates? *See generally* McCrea, *Awarding In-service Appreciation to Public Utility Ratepayers—Windfall or Perdition?* 11 Cal.W.L.Rev. 160 (1974). The Commission's finding that the sale of the two units was in the public interest is not challenged by anyone. The parties dispute only the included conditions and findings relative to the accounting transactions that the "public-interest" finding incorporates and requires.

We believe the Commission had the general regulatory power to assign all or a part of the annual payments to either account for rate purposes, "other utility income" or "non-utility income." The question under discussion concerns the validity of the Commission's exercise of the power under the rate-calculation standards of PURA and the three methods designed to secure regulated utilities the return they are constitutionally entitled to receive: the comparable-earnings test, the financial-integrity test, and the attraction-of-capital test. These have remained the criteria for constitutionally sufficient rates from *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), through *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Pond, *The Law Governing the Fixing of Public Utility Rates: A Response to Recent Judicial and Academic Misconceptions*, 41 Admin.L.Rev. 1, 9–13 (1989). A rate that does not meet the requirement of these tests is "unjust, unreasonable and confiscatory" under the 14th Amendment of the United States Constitution. Pond, *supra*, at 9 (quoting *Bluefield*, 262 U.S. 679, 43 S.Ct. 675). The rate-fixing provisions of PURA necessarily incorporate these constitutional considerations.

We believe the Court of Appeals of Kansas properly identified some of the factors to be considered by a regulatory body in deciding whether, and to what extent, utility ratepayers should benefit through lower rates from a utility's realized "gain" on the sale of depreciable fixed assets formerly included in the rate base. *Kansas Power & Light Co. v. State Corp. Comm'n*, 5 Kan.App.2d 514, 620 P.2d 329 (1981). These factors have an obvious relevance to the three constitutional tests mentioned above, and to statutory requirements such as PURA § 38 that mandate "just and reasonable" rates. The Kansas court recognized the general proposition that such capital gains are ordinarily retained by the utility and used for reinvestment or the payment of dividends. *Id.* at 341. When the utility applies for a rate adjustment, however, the following factors should be considered in deciding a proper division and allocation of the gain, if any should be made at all:

(1) The risk of loss of investment capital.

(2) Contribution by the ratepayers to the value of the property, such as maintenance, upkeep and improvements.

(3) Financial integrity of the company, and the effect of the allocation on the price of the stock and the ability of the company to attract adequate capital.

(4) Increases in the value of the property due to inflation.

(5) Increased value of the property due to improvements in the neighborhood ... as a result of special assessments for such things as curbing, guttering, sewage treatment plants, sewers, water, water treatment plants, general street facilities, neighborhood improvement districts, urban renewal, and other matters resulting in increased value of the property which were paid in whole or in part by the ratepayers.

The court pointed out that these were not intended to be "all inclusive." [8] We should think, therefore, that a regulatory body might consider *any* factor logically related to any of the three constitutional tests or to the determination of "just and reasonable" rates under a statutory provision such as PURA § 38.

In the present case, however, the Commission explicitly considered the issue and made its decision *solely* upon *one* basis: two witnesses testified that Gulf's ratepayers "should" receive the benefit of the sums realized by Gulf in the sale, in specified percentages, the Commission choosing 83% because Gulf had previously recovered

through depreciation expense 83% of the original cost of the two generating units. From this, the Commission reasoned that ratepayers "should" benefit through diminished rates in the future—not by recovery of the total depreciation expense alone, but benefit as well to the extent of 83% of any sums over and above the total depreciation taken against the two units while they were in public service.

The Commission and the Office of Public Utility Counsel argue that the 83% determination is supported by "substantial evidence," referring, of course, to the testimony of the two witnesses concerning what decision the Commission "should" make in the matter. They point as well to the general rationale for assigning a portion of such gains to ratepayers, as stated by one of the witnesses:

[T]he Company's proposed disposition of the gain would create perverse incentives for a utility to liquidate the most valuable certificated [sic] property, thus leaving the regulated franchise as a haven for the automatic recovery of book costs associated with less productive plant.

Or, as better stated elsewhere:

If utilities have the right to charge ratepayers for expensive new generating plants, at cost, in the early years, when the power may not be economically competitive, and then sell off the asset to another entity once inflation makes the power cost-effective, and keep the profit for the stockholders, ratepayers are in an untenable bind. Every coal plant in the country built more than 5 years ago will

---

**8.** We point out these factors only to demonstrate that a division and allocation of gain, from the sale of a utility's fixed asset, may invoke a variety of considerations, some of which might bear upon mere reasonableness or upon the constitutional tests that must be accounted for in arriving at a utility's rate. Not all will apply in every case, and unlisted factors may apply in another case. Decisions in these matters rest, of course, in the initial power of the Commission. It may determine, for example, that assigning all the gain to the benefit of the ratepayers, through lower rates in the future, will likely reduce the attraction of new capital that the utility requires.

In the present case, the record indicates that the Commission gave *no* consideration to *any* factor

whatever before directing the 83%—17% division based on the accumulated depreciation taken on the two generating units in years past, and made its decision solely on the fiction that the ratepayers had "paid" 83% of the original cost and assigned that percentage to "other utility income" on the recommendation of two witnesses that the Commission "should" take that action. *The mere fact that the ratepayers had "paid" 83% of the original cost, in past years, does not automatically render "fair," "just," or "reasonable" the allocation ordered by the Commission in absolute terms for the purpose of governing future rate proceedings.* The issue is more complicated than that, as indicated in the decision of the Kansas Court of Appeals.

change hands, as will all of the nuclear plants placed in operation prior to 1980, so that utilities can revise their rate base up to "replacement cost" or fair value. T. Eisenberg, *Bankruptcy in the Administrative State*, 50 L.Contemp.Probs. 38 (1987).

These generalities are essentially meaningless in the present case as furnishing a reasonable evidentiary basis for the Commission's decision relative to the 83%—17% division and allocation. The Commission explicitly determined that the sale of the two units was in the public interest in a case where it was not disputed that Gulf was moved to sell them because it was threatened with a loss of large industrial customers and a resulting adverse affect on its remaining ratepayers. Indeed, the Commission adopted the hearing examiner's findings that Gulf had "lost 430 MW [megawatts] of industrial electric load to cogeneration," that the customers who threatened to leave Gulf's service "have a total load of approximately 200 MW," and that they "will likely turn to self-generation if the Venture does not go forward." There is no finding, and no contention on appeal, that Gulf might have sold other generating units to the joint venture.

In substance, then, the Commission's final order, as supported by those parts of the examiner's report that the Commission expressly adopted, reflect only that the 83%—17% division and allocation results from the opinion of two witnesses concerning what the Commission "should" do because of a general rationale that regulated utilities might otherwise sell their most efficient assets and reap the benefits, while retaining their least efficient assets to be subsidized by ratepayers. In other words, we are asked to determine that the *particular* division and allocation made here, with respect to *particular* assets, has a reasonable basis in the agency order and record when these contain only *generalities* about what the Commission "should" do to avoid abuses that are *not shown to be applicable* to the case under the agency's express findings.

It may be that the 83%—17% division and allocation can be reasonably supported by existing administrative policies and the particular facts and circumstances of the case. We hold, however, that they are not reasonably supported by the agency order and record furnished us in this instance, and that the Commission determination is arbitrary and capricious as a result. We therefore reverse the Commission's final order and remand the case to the Commission.

For the reasons given, we reverse the Commission order and remand the case to the agency. APTRA § 19(e)(4), (5), (6).